INSURANCE COMPANY OF NORTH AMERICA, Plaintiff-
Respondent,

v.

DEC INTERNATIONAL, INC., Defendant-Appellant.†

Court of Appeals

*No. 97–0701. Oral argument December 17, 1997.—Decided
July 9, 1998.*

(Also reported in 586 N.W.2d 691.)

†Petition to review denied.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Michael S. Anderson* and *Christopher P. Koback* of *Axley Brynelson* of Madison and orally argued by *Christopher P. Koback*.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Bruce Gillman* of *Tomlinson, Gillman & Rikkers, S.C.* of Madison, and orally argued by *Bruce Gillman*.

Before Eich, C.J., Dykman, P.J., and Roggensack, J.

DYKMAN, P.J.   DEC International, Inc. (DEC) appeals from a money judgment in favor of Insurance Company of North America (INA) in the amount of $595,417. This lawsuit arose when DEC refused to pay INA three million Danish Kroner that INA had paid as a surety for DEC. We conclude that the trial court's finding that DEC and INA intended that a letter from DEC to an insurance group (CIGNA) to be an indemnity agreement was not clearly erroneous. We further conclude that INA proved that it suffered a loss, and that it made an adequate investigation of the facts before it paid the money as surety for DEC. Accordingly, we affirm the trial court's judgment.

The Dairy Crest Cheese & Whey Group (Dairy Crest), an English dairy, contracted with a Danish subsidiary of DEC, DEC Elektrogeno A.S. (DECEL) to build a whey processing plant for Dairy Crest. Dairy Crest and DECEL agreed that DECEL would provide a performance bond. The bond would permit Dairy Crest to pay DECEL in full for all invoices, without holding back a portion of the invoice amount until the whey processing plant was operating as agreed upon. DECEL procured a bond from Home Insurance Company of London. Significant portions of the bond read as follows:

> In consideration therefore of [Dairy Crest] paying [DECEL] in full settlement of his invoices without any deduction by way of retention,

> WE HEREBY IRREVOCABLY GUARANTEE to pay on [Dairy Crest's] first demand the sum of [three million Danish Kroner] subject to the following conditions:

1. [Dairy Crest's] demand shall be in writing and shall state,

    (a)  you have given [DECEL] 14 days notice in writing of your intention to claim under this guarantee.

    (b)  [DECEL] has failed to perform his contractual obligations with full details of all such alleged failures and the relevant clauses in the Contract . . . .

    . . . .

4. This guarantee shall expire 365 days from the date of "Take-Over," however not later than 31st August 1986 and thereafter shall be wholly null, void, and unenforceable.

The bond contains no definition of "Take-Over;" however, the contract between DECEL and Dairy Crest does.

On August 27, 1984, DEC sent to CIGNA Worldwide Inc. the following letter:[1]

CIGNA Worldwide, Inc.
120 Wall Street
New York, NY, 10005

RE: Guarantee of Forfeiture Form

Gentlemen:

Whereas DEC Elektrogeno A/S (Principal) has entered into a contract with Dairy Crest Cheese and Whey Group (Obligee) to supply Whey Processing Plant at Dairy Crest Creamery at Davidstown as per contract dated June 4, 1984, and whereas, said contract requires the Principal to post bonds which are forfeiture in form (payment-on-demand), we

---

[1] We will discuss the relationship between CIGNA and INA later in this opinion.

DEC International, Inc., as Indemnitor, agree to place CIGNA Worldwide Inc. or any of its member or affiliate companies in all funds necessary to satisfy any demand on said bond within 48 hours of such demand. Said funds shall be made available to CIGNA Worldwide at its office at 120 Wall Street, New York, New York U.S.A.

DEC also signed an indemnity agreement on January 17, 1984, in which it agreed to indemnify several insurance companies that had acted as sureties for DEC. However, the trial court concluded that INA had not proven that it was a surety under this agreement and dismissed INA's cause of action against DEC stemming from this agreement. INA has not cross-appealed this dismissal, and we need not consider it further.

Disputes between DECEL and Dairy Crest eventually developed, and on July 18, 1986, Dairy Crest sent DECEL a telex, notifying it that Dairy Crest intended to make a claim under the bond. DEC sued Dairy Crest, requesting an injunction preventing Dairy Crest from making a claim under the bond. The case was adjourned, and no injunction was granted. On August 4, 1986, Dairy Crest mailed CIGNA a demand for payment of the full amount of the bond. Dairy Crest also included engineer's certificates asserting that the plant performed improperly and engineer's reports detailing the defects it believed existed. On September 19, 1986, Dairy Crest's attorneys called CIGNA and threatened to sue on the bond and attach CIGNA's bank accounts in England. CIGNA determined from its own lawyers that this was possible. CIGNA concluded that such a suit and attachment would adversely affect its ability to write bonds in England, and on September 30, 1986, it paid Dairy Crest the three million Danish

Kroner. After it was unable to obtain reimbursement from DEC, it began this lawsuit.

## DID DEC AGREE TO INDEMNIFY INA?

■■■■ DEC argues that the August 27, 1984 letter that it sent to CIGNA is not an indemnity agreement but a collateral deposit provision, which is enforceable only through an action for specific performance. The meaning of an unambiguous contract is a question of law. *Fillbach v. Production Credit Ass'n*, 141 Wis. 2d 767, 771, 416 N.W.2d 617, 618 (Ct. App. 1987). We therefore owe no deference to the trial court's decision. *Id.* This court determines, as a matter of law, whether ambiguity exists. *Golden Valley Supply v. American Ins. Co.*, 195 Wis. 2d 866, 878, 537 N.W.2d 58, 62 (Ct. App. 1995). A contract provision which is reasonably susceptible to more than one construction is ambiguous. *Id.* If ambiguity exists, then the intent of the parties is a question of fact. *Wausau Underwriters v. Dane County*, 142 Wis. 2d 315, 322, 417 N.W.2d 914, 916 (Ct. App. 1987).

> [T]rial court's factual findings are reviewed under a clearly erroneous standard, and we will give due regard to that court's ability to assess witness credibility. Such factual findings will be upheld as long as they are supported by any credible evidence or reasonable inferences that can be drawn therefrom.

*Schreiber v. Physicians Ins. Co.*, 217 Wis. 2d 94, 102, 579 N.W.2d 730, 733 (Ct. App. 1998) (citations omitted).

The August 27, 1984 letter is susceptible to more than one construction. If one focuses on the words "place . . . in all funds," those words have the meaning

that a surety, having deemed itself insecure, may require a principal to forward funds to cover a potential loss or a possible demand. The significance of this language is that it is enforced before a loss by an equitable action. However, if one focuses on the identification of DEC as an "indemnitor," and the fact that DEC agrees to satisfy "any" demand, one could conclude that the letter is an agreement for DEC to indemnify CIGNA or any of its member or affiliate companies. Indemnification occurs after a loss and is enforced by a suit at law. Thus, since the letter is susceptible to two competing constructions, it is ambiguous.

■ Having concluded that the August 27, 1984 letter is ambiguous, our object is to ascertain and effectuate the parties' intent. This may be gathered from surrounding words and circumstances. *Spencer v. Spencer,* 140 Wis. 2d 447, 450, 410 N.W.2d 629, 631 (Ct. App. 1987). We do so keeping in mind the deference we owe to the trial court's findings as to the intent of the parties. Why did the trial court find that "[T]he parties intended that Exhibit 11 [the August 27 letter] operate as a type of additional indemnity agreement?" The court relied upon a witness, Brian Fallon, who testified that it was INA's practice to get agreements to indemnify for any money paid out on a claim from a United States Company, because a United States Company is more likely to resist the payment of a claim. Fallon, the European manager of INA in 1984, testified:

Q:  What is a placement in funds letter?

A:  It's confirmation that, in the event that we issue a bond which the employer may call on their first demand without having to prove default, that the indemnitor understands

that they will have to pay their claim irre-
spective of whether they judge it to be a
legitimate claim or not.

We conclude that a sufficient quantum of evidence exists to support the trial court's finding that INA and DEC intended the August 27 letter to be an indemnification agreement. That finding is not clearly erroneous. Accordingly, we accept it.

DEC asserts that the August 27 letter is unambiguous, and that case law construing similar agreements holds that "placement in funds" agreements are not indemnification agreements. The construction of an unambiguous document is a matter of law that this court reviews *de novo. Kane v. Employer's Ins. of Wausau*, 142 Wis. 2d 702, 705, 419 N.W.2d 324, 326 (Ct. App. 1987). But because we have concluded that the August 27 letter is ambiguous, and the construction of an ambiguous document involves a question of fact, the trial court's finding as to its meaning will be upheld unless clearly erroneous. *Patti v. Western Machine Co.*, 72 Wis. 2d 348, 353–54, 24 N.W.2d 158, 161 (1976). However, we will examine *American Motorists Ins. Co. v. United Furnace Co.*, 876 F.2d 293 (2d Cir. 1989) and *Gas Reclamation, Inc. Securities Litigation*, 741 F. Supp 1094 (S.D.N.Y. 1990) to determine whether they should shape our decision.

In *American Motorists*, the agreement between the insurance company (AMICO) and the insured, United Furnace Co., related to a bond issued by AMICO to the United States of America. *American Motorists*, 876 F.2d at 294–95. That bond was not an "on demand" bond, but it was on a form proscribed by 19 CFR § 113.62. *Id.* at 296. AMICO agreed to pay, as demanded by customs, all additional duties, taxes, and

charges subsequently found due, legally fixed, and imposed on any entry secured by this bond. *Id.*

The August 27, 1984 agreement between DEC and INA related to a very different bond. In INA's bond, it promised: "WE HEREBY IRREVOCABLY GUARANTEE to pay on your first demand the sum of DKK 3 million . . . ."[2] The difference between the two bonds is striking. The AMICO bond contemplated a payment only after charges had been "subsequently found due" and "legally fixed." The INA bond was an agreement to pay on demand. The trial court could reasonably infer that INA, having agreed to issue an on-demand bond, would require an indemnification from DEC that would not become entangled in any dispute between DECEL and Dairy Crest. *American Motorists* deals with a differently worded indemnity agreement and a differently worded bond. It does not hold that any bond, written in conjunction with any indemnification agreement, is only a placement in funds agreement and not an agreement to indemnify.

*Gas Reclamation* involved complicated litigation between investors in a failed business. In *Gas Reclamation*, several banks were the beneficiaries of bonds issued by Northwestern National Insurance Company to guarantee the payment of promissory notes. *Gas Reclamation*, 741 F. Supp. at 1096. When the notes were not paid as agreed, the banks sued Northwestern. *Id.* The court concluded that Northwestern had waived defenses to the payment of the notes, and it granted partial summary judgment to the banks. *Id.* at 1104. The court also denied Northwestern's motion for exoneration, or *quia timet* relief, both equitable remedies which require the bond's guarantors to pay the notes or

---

[2] The INA bond was written by the Home Insurance Company, not by INA. We will discuss this fact later in this opinion.

place a surety in funds. *Id.* at 1107. *Gas Reclamation* did not involve a claim for indemnification by Northwestern, which is what INA claims against DEC. Though we agree with *Gas Reclamation*'s statement that the right to placement in funds relief is separate and distinct from a surety's right to indemnification, *Gas Reclamation* determined that Northwestern was not entitled to placement in funds relief. The *Gas Reclamation* court was not asked and did not decide whether Northwestern was entitled to indemnification. Neither *Gas Reclamation* nor *American Motorists* require a holding that, as a matter of law, INA is not entitled to indemnification from DEC.

## INA'S STANDING

DEC next argues that INA failed to prove that it suffered a loss for which DEC was liable. It reasons that because the bond protecting Dairy Crest was written by The Home Insurance Company, and INA failed to show that it was an affiliate or member company of CIGNA, INA could not recover on the Home Insurance Company's bond.

The August 27, 1984 letter from DEC to CIGNA reads: "[W]e DEC International, Inc., as Indemnitor, agree to place CIGNA Worldwide Inc. or any of its member or affiliate companies in all funds necessary . . . ." We need not discuss the relationships between CIGNA, Home Insurance Co., and INA because on October 21, 1993, INA asked DEC to admit the following: "That INA is the proper party plaintiff in this action as assignee of any claim resulting to the surety by virtue of the payment made under the bond." DEC admitted that "INA is a proper party pursuant to the August 27, 1994 agreement, because it is an affiliate of CIGNA Worldwide, Inc." Section 804.11(2), STATS.,

notes the following regarding the effect of an admission of this sort: "Any matter admitted under this section is conclusively established unless the court on motion permits withdrawal or amendment of the admission."

DEC's reply brief does not respond to INA's argument that DEC has admitted INA's standing. Instead, it addresses the merits of whether an allocation to INA of a loss by another company created a right to sue. A proposition asserted by a respondent on appeal and not disputed by the appellant's reply is taken as admitted. *Madison Teachers v. Madison Metro. Sch. Dist.*, 197 Wis. 2d 731, 751, 541 N.W.2d 786, 794 (Ct. App. 1995). We conclude that DEC has admitted INA's assertion that DEC's admission precludes further litigation of whether an allocation of a loss creates a legal loss, because it failed to respond to INA's assertion in its brief.

## BOND EXPIRATION ISSUES

The paragraph of the Home Insurance Company bond which forms the basis of this issue reads as follows: "This guarantee shall expire 365 days from the date of 'Take-Over,' however not later than 31 August 1986 and thereafter shall be wholly null, void, and unenforceable." The parties agree that Dairy Crest made demand on the bond on August 4, 1986. They differ as to when "Take-Over" occurred. DEC contends that this occurred before August 31, 1985, and INA argues that it occurred later. To complicate matters, the whey plant was not finished at one time; parts of it were finished at different times. Each part required a "Take-Over Certificate." The term "Take-Over" is not defined in the bond, but it is defined in the contract between Dairy Crest and DECEL as the date on which a "Take-Over" certificate was issued.

DEC asserts that if a surety pays on an expired bond, the surety is not entitled to indemnification from the principal. INA does not take issue with that proposition in the usual case, where the expiration of a bond is a date and not, as here, an occurrence. Unfortunately, when a bond is issued with an expiration date triggered by an occurrence, or, as here, with a series of occurrences, a surety will find it more difficult to determine whether the bond has expired. And, as here, the parties to the underlying contract, and the principal (DEC) will take expected positions as to its date of expiration. When determining the proper principles of suretyship law to apply, a court must first consider the requirements of the bond, and what the parties were trying to accomplish by using the bond.

Thus, the Restatement of Suretyship and Guaranty cautions that even when taking the first step—deciding whether the law of suretyship and guarantee applies—the substance of a transaction governs, rather than its form. RESTATEMENT (THIRD) OF SURETYSHIP AND GUARANTY, 3 (1995) We think that this principle applies also to the documents used by the parties in this case, including the Home Insurance Company bond and the August 27, 1984 letter.

There is one dominant factor in this case. The bond issued by Home Insurance Company is an "on demand" bond. The operative language in the bond is "WE HEREBY IRREVOCABLY GUARANTEE to pay on your first demand the sum of . . . ." The purpose of an "on demand" bond is to provide the insured with a guaranteed quick and easy way to obtain funds that it cannot get from another. There were only two conditions in the Home Insurance Company bond: (1) that Dairy Crest had given DECEL fourteen days' written notice of its intent to make a demand under the bond,

851

and (2) that Dairy Crest must state that DECEL has failed to perform its contractual obligations, with details of the failure. DEC concedes that INA did not have to investigate further whether Dairy Crest or DECEL would win their dispute. Were this required, an "on demand bond" would be no different than any other bond. But the same holds true as to investigations into whether the Home Insurance Company bond had expired. INA concedes that it had an obligation to determine whether Dairy Crest's claim had been made before or after August 31, 1986. We agree that even an "on demand" bond carries with it a requirement to determine whether the expiration date of a bond has passed, if the bond expires on a date rather than on an occurrence. But sorting out the claims and counterclaims about when "take-over" had occurred is another matter. If a bonding company were required to thoroughly investigate whether a "take-over" had occurred, and pay at the risk of being a volunteer, the quick and easy payment which is the dominant feature of "on demand" bonds would disappear.

There is another factor which supports the trial court's conclusions. David Fisher, the manager of the special lines department at CIGNA, testified that had CIGNA or INA not paid Dairy Crest's call on the bond, there would have been significant consequences for CIGNA. Fisher testified to the following:

> It would have been quite disastrous to our credibility as a surety company. If you have a pure on demand guarantee without any real deference[,] and you go to court and lose, then nobody thinks very highly of you, and your acceptability to other people when offering bonds is somewhat reduced, and also to your clients. So, potentially, clients would say[,] "Well, there is no point in placing our

bond facility with CIGNA because no one will take their bonds or otherwise there will be a problem with people taking their bonds." I mean, confidence is a very important factor in marketing your pieces of paper in exchange for other people parting with money, and so you can't really afford to let anything slip in that area.

An affidavit of Alan Wade, executive casualty claims adjuster for CIGNA, notes the same thing, but more graphically. Wade's affidavit said that he had received a call from Dairy Crest's lawyers, threatening that unless CIGNA paid on the bond, Dairy Crest would freeze one or more of CIGNA's bank accounts. The affidavit reads as follows:

> Obviously, this was a consequence that had to be prevented at all costs as it would cripple, if not destroy, the reputation and ability of my company to transact business of this sort in the UK.
>
> Following a telephone conversation I had with one of our own London solicitors, it was quite clear to me that the solicitors for Dairy Crest could, indeed, undertake to obtain such a court order.

The Restatement addresses these types of situations. It states the following:

> Where, however, a secondary obligor is under business compulsion to perform and the principal obligor is charged with notice of the secondary obligation and of the business compulsion, there is right of reimbursement irrespective of the secondary obligor's defenses arising out of the secondary obligation, suretyship status, or defenses of the principal obligor available to the secondary obligor. In this context, "business compulsion to perform" refers to situations in which the secondary obligor

has no legal duty to perform but business reasons practically require performance.

RESTATEMENT (THIRD) OF SURETYSHIP AND GUARANTEE § 24 cmt. e (1995).

The trial court found that the August 27, 1984 letter was freely agreed to by two sophisticated corporations experienced in international business, and that under the circumstances, some of which we have described, the parties intended that letter to be an additional indemnity agreement. This finding contradicts DEC's assertion that the letter was only a placement in funds agreement, which required DEC to advance funds to INA to satisfy a future loss, but not a loss already incurred. The trial court's finding has adequate evidence to support it; therefore, the finding was not clearly erroneous. Insofar as DEC is contending that the issue in this case is legal and not factual, we conclude that the cases it cites are inapposite, and that the Restatement supports a conclusion that CIGNA or INA was under a business compulsion to pay Dairy Crest. Therefore, INA was entitled to indemnity from DEC. Accordingly, we affirm the trial court's judgment.

*By the Court.*—Judgment affirmed.