In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-1285

CONFOLD PACIFIC, INC.,

*Plaintiff-Appellant*,

*v.*

POLARIS INDUSTRIES, INC.,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 03 C 829—**Lynn Adelman**, *Judge*.

ARGUED SEPTEMBER 23, 2005—DECIDED JANUARY 10, 2006

Before POSNER, RIPPLE, and ROVNER, *Circuit Judges*.

POSNER, *Circuit Judge*. The district judge granted summary judgment for the defendant, Polaris, a manufacturer of snowmobiles and other vehicles, in this diversity suit by ConFold for breach of contract and unjust enrichment. Polaris used to ship its vehicles in disposable containers, but in 1993 it began considering the possibility of using returnable containers instead. ConFold was a new company that wanted to produce such containers, and in the following two years, assisted by a management consulting and software development firm named CAPS Logistics, it conducted a "reverse logistics analysis" of Polaris's ship-

ping needs. That is an analysis of how best to deal with goods returned by customers, for example whether to refurbish and resell them, recycle them, reuse their components, sell them as scrap, or tell the customer to discard them. Sarah Mason, "Backward Progress," *Industrial Engineer*, Aug. 1, 2002, p. 3; Patricia J. Daugherty, "Information Support for Reverse Logistics: The Influence of Relationship Commitment," 23 *J. Bus. Logistics* 85 (2002). It was conducted pursuant to an agreement, prepared by ConFold, between it and Polaris that was entitled "Mutual Non-Disclosure Agreement—Logistics Consulting Version." That agreement is the basis of ConFold's claim of breach of contract.

Two months after the agreement was signed, Polaris requested proposals for the design of a returnable container that would fit its needs. The request was sent to nine firms, including ConFold. All ConFold was told was that "your design will be one of nine considered at this point." Polaris accepted none of the proposals. But a few years later it designed a returnable container and subsequently began using containers manufactured by a firm to which it had given the design. ConFold claims that Polaris's design was based on the design that ConFold had submitted to Polaris in response to the request for proposals.

The breach of contract issue is whether the "Mutual Non-Disclosure Agreement—Logistics Consulting Version" bound Polaris not to reveal to a third party any returnable-container design that ConFold submitted to Polaris. The title of the contract suggests it did not, that the scope of the nondisclosure agreement was confined to reverse logistics analysis. The suggestion is reinforced by the timing; for when the contract was signed, the dealings between the parties related only to that analysis, which

ConFold was to conduct for Polaris. The preamble to the contract states, moreover, that "ConFold has information relating to its proprietary software systems, documentation, and related consulting services which it considers to be proprietary," and the phrase "software systems, documentation, and related consulting services" refers to the reverse logistics analysis itself, for it was to that analysis that the software, documentation, and consulting services pertained. The implication is that the only proprietary information that ConFold would be revealing to Polaris would be information relating to the analysis.

This interpretation is bolstered by the statement in the contract that it is the "entire Agreement between the two parties concerning the exchange and protection of proprietary information *relating to the program*" (emphasis added). The only program in the contemplation of the parties was the software program to be used to produce the reverse logistics analysis, and the information that would be proprietary was the software and other materials relating to that analysis. It is one thing to determine whether a customer ought to switch to returnable containers and another to design the containers that the customer will use if he does switch. There is no hint in the contract that the design of containers was within its scope.

The district judge might have decided that the contract unambiguously excluded design information, in which event no evidence beyond the contract itself would have had to be considered. Especially when dealing with a substantial contract between "commercially sophisticated parties . . . who know how to say what they mean and have an incentive to draft their agreement carefully," *Bank of America, N.A. v. Moglia*, 330 F.3d 942, 946 (7th Cir. 2003), there is great merit to the rule that the meaning of an

unambiguous contract is a question of law rather than of fact, e.g., *Columbia Propane, L.P. v. Wisconsin Gas Co.*, 640 N.W.2d 819, 826 (Wis. App. 2001), rev'd on other grounds, 661 N.W.2d 776 (Wis. 2003); *Insurance Co. of North America v. DEC Int'l, Inc.*, 586 N.W.2d 691, 693 (Wis. App. 1998), with the consequence "that unambiguous contractual language must be enforced as it is written." *Town of Neenah Sanitary Dist. No. 2 v. City of Neenah*, 647 N.W.2d 913, 916 (Wis. App. 2002); see also *Folkman v. Quamme*, 665 N.W.2d 857, 864 (Wis. 2003). The rule enables contract disputes to be resolved quickly and cheaply, "protects the parties against the vagaries of the litigation process—a major reason for committing contracts to writing—without too great a risk of misinterpretation," and by thus minimizing both contractual transaction costs and uncertainty increases the value of contracts as means of conducting business. *Bank of America, N.A. v. Moglia*, *supra*, 330 F.3d at 946.

Enforcing contracts as written has particular merit when the party that drafted the contract, which is to say ConFold (though, as we'll see, ConFold was largely copying an earlier contract drafted by someone else), is arguing that it should be relieved from the consequences of having neglected to spell out its rights concerning the very core of the transaction. *Walters v. National Propertie*s, *LLC*, 699 N.W.2d 71, 75 (Wis. 2005); *Tranzact Technologies, Ltd. v. Evergreen Partners, Ltd.*, 366 F.3d 542, 546 n. 2 (7th Cir. 2004); *Harris v. Union Electric Co.*, 787 F.2d 355, 365 n. 7 (8th Cir. 1986). For the *only* subject of the contract was confidentiality. Polaris, though it knew that ConFold manufactured returnable containers, couldn't be expected to peek into ConFold's mind and discover that ConFold thought the duty of confidentiality extended to materials, namely container designs, that were neither mentioned in the contract nor germane to the project for which

Polaris had hired ConFold, which was a consulting rather than a design project.

It is true that a contract can be clear on its face—clear, that is, to a reader not familiar with the commercial context—yet still be ambiguous when that context is restored. That is the domain of "extrinsic" or "latent" ambiguity. *Dispatch Automation, Inc. v. Richards*, 280 F.3d 1116, 1121 (7th Cir. 2002); *Evergreen Investments, LLC v. FCL Graphics, Inc.*, 334 F.3d 750, 756 (8th Cir. 2003); *Mews v. Beaster*, 694 N.W.2d 476, 479 (Wis. App. 2005). The parties to a sale of cotton may have specified that the cotton be shipped on the ship *Peerless*—nothing ambiguous about such a provision to the uninformed reader—but if it turns out that there are two ships by that name to which the contract might refer, the contract is revealed as ambiguous and extrinsic evidence (evidence beyond the words of the contract) is admissible to help resolve the ambiguity. *Raffles v. Wichelhaus*, 2 H. & C. 906, 159 Eng. Rep. 375 (Ex. 1864).

The district judge found the contract in this case ambiguous, but not because of anything in the commercial context. Rather, he thought it ambiguous on its face, requiring him to consider extrinsic evidence, *First Bank & Trust v. Firstar Information Services, Corp.*, 276 F.3d 317, 322 (7th Cir. 2001) (Wisconsin law), because of the further statement in the preamble that "ConFold and Polaris are desirous of exchanging information for purposes of both companies developing future business with each other." The referent of "future business" could just be the reverse logistics analysis, which had not begun because Polaris refused to approve the project until a confidentiality agreement was signed; it was in response to that demand that Confold submitted the agreement. But a more natural reading, reinforced by the fact that the quoted language is in that agreement and the

logistics analysis is the subject of the agreement and thus "present" rather than "future" business, is that the reference was to a possible future sale by ConFold of returnable containers to Polaris. The parties hoped not only that the exchange would enable successful completion of the analysis but also that, if so, it might provide the foundation for a fruitful relationship at the next stage, when (and if) Polaris went into the market to buy returnable containers, possibly from ConFold. It is not unusual for a firm to be hired first as a consultant to advise a buyer on his needs, and later, when those needs are formulated, to bid to supply them; and ConFold's initial proposal to Polaris for the reverse logistics analysis actually quoted a price for additional services—including design.

The quoted language is best understood, however, as merely an explanation for why the parties were exchanging information, and committing to its confidentiality, concerning the reverse logistics analysis. They hoped to do future business; they did not commit to. ConFold's interpretation lacks sensible limits. It spreads the blanket of confidentiality over "exchanging information"—any information. This would require that any information the parties exchanged, including their phone numbers, be kept confidential (forever?), and that is an implausible intention to impute to them.

But having rightly or wrongly decided that the contract was ambiguous, the district judge turned to the extrinsic evidence—and concluded that it clinched Polaris's interpretation of the contract rather than creating a triable issue. The briefs in our court contain a confusing discussion of how a court should treat extrinsic evidence under various assumptions. ConFold mistakenly concedes that if that evidence is undisputed, the judge can interpret the contract

without recourse to a trial. Not so; for if there is tension between that evidence and the words of the contract, or if for any other reason the meaning of the contract remains uncertain even after the extrinsic evidence is presented, there must be a trial to determine the contract's meaning. *In re Modern Dairy of Champaign, Inc.*, 171 F.3d 1106, 1109 (7th Cir. 1999); *Mathews v. Sears Pension Plan*, 144 F.3d 461, 468 (7th Cir. 1998). The task of the trier of fact in a contract case includes putting together bits and pieces of evidence in order to create a convincing mosaic of meaning, rather than just resolving outright conflicts in extrinsic evidence. *Western Industries, Inc. v. Newcor Canada Ltd.*, 739 F.2d 1198, 1205 (7th Cir. 1984) (Wisconsin law).

Nevertheless the undisputed extrinsic evidence so strongly supported Polaris that, considering that the language of the contract was only minimally ambiguous, a trial could have had but one outcome. For it turned out that the confidentiality agreement had been copied from ConFold's confidentiality agreement with CAPS, a contract drafted by CAPS and limited to that firm's proprietary software and related intellectual property; CAPS does not design containers. Moreover, ConFold had a form confidentiality agreement "specific for design" but did not ask Polaris to sign it.

So summary judgment was properly granted on the contract claim, and we turn to the other claim, which is for unjust enrichment. ConFold contends that by exploiting its design for returnable containers Polaris wrongfully enriched itself to the tune of more than $25 million. Polaris denies that the returnable containers that it is using are based on ConFold's design, but the district judge did not reach that issue; nor need we.

ConFold argues that Minnesota law governs the unjust enrichment claim, Polaris that Wisconsin law does. (The contract claim is governed by general principles of contract law, rather than anything special to the law of either state.) Wisconsin law denies recovery for unjust enrichment if all the defendant has done is use (to his profit) an idea of the plaintiff that is not a trade secret. *Gary Van Zeeland Talent, Inc. v. Sandas*, 267 N.W.2d 242, 249 (Wis. 1978); *Abbott Laboratories v. Norse Chemical Corp.*, 147 N.W.2d 529, 541 (Wis. 1967). Minnesota law contains hints of a contrary view. *Rehabilitation Specialists, Inc. v. Koering*, 404 N.W.2d 301, 302, 306-07 (Minn. App. 1987); *Tate v. Scanlan Int'l, Inc.*, 403 N.W.2d 666, 671-72 (Minn. App. 1987); *Micro Display Systems, Inc. v. Axtel, Inc.*, 699 F. Supp. 202, 205 (D. Minn. 1988) (Minnesota law). We doubt that there is a real conflict, for reasons explained below. But in any event the district judge was correct that Wisconsin would apply its own law to a case such as this. The Wisconsin cases adopt a presumption in favor of applying Wisconsin law to cases litigated in the state, as this case was. *State Farm Mutual Automobile Ins. Co. v. Gillette*, 641 N.W.2d 662, 676 (Wis. 2002); *Hunker v. Royal Indemnity Co.*, 204 N.W.2d 897, 902-03 (Wis. 1973); *Wilcox v. Wilcox*, 133 N.W.2d 408, 416-17 (Wis. 1965). The presumption, the district judge rightly concluded in granting summary judgment for Polaris on this branch of the case as well, has not been rebutted, especially when we consider that ConFold both is incorporated in Wisconsin and, more important, has its principal place of business there. *Beloit Liquidating Trust v. Grade*, 677 N.W.2d 298, 306-07 (Wis. 2004).

The parties have hurled at us a bewildering array of terms on this branch of the case—"unjust enrichment," of course, but also "restitution," "trade secret," "misappropriation," "quasi-contract," "quantum meruit," and others. Let us try

to make sense of them. (Proliferation of terms is a bane of the law.) "Unjust enrichment," and its synonym "restitution," has two referents, a remedial and a substantive. The remedial is to a situation in which a tort plaintiff asks not for the damages he has sustained but instead for the profit that the defendant obtained from the wrongful act. *Hoagland ex rel. Midwest Transit, Inc. v. Sandberg, Phoenix & von Gontard, P.C.*, 385 F.3d 737, 744-45 (7th Cir. 2004). If Polaris by copying (we are assuming) ConFold's design saved money, that was a gain to which ConFold is entitled—provided the copying was a wrongful act.

In its substantive sense, unjust enrichment or restitution refers primarily to situations in which either the defendant has received something that of rights belongs to the plaintiff (for example, he received it by mistake—or he stole it), or the plaintiff had rendered a service to the defendant in circumstances in which one would reasonably expect to be paid (and the defendant refused to pay) though for a good reason there was no contract. An example of the second case is that of the physician who renders services to an unconscious person and later sends him a bill that the patient refuses to pay. *In re Crisan's Estate*, 107 N.W.2d 907, 910-11 (Mich. 1961); *Cotnam v. Wisdom*, 104 S.W. 164 (Ark. 1907). In either case, restitution of the value of the benefit received (the mistaken payment in the first case, the normal fee for such a medical service in the second) enforces reasonable expectations.

The physician case, however, also parades under the name of "quasi-contract," on which see, e.g., *Goldstick v. ICM Realty*, 788 F.2d 456, 467 (7th Cir. 1986). For the court is constructing a contractual relationship in order to bring about the result for which the parties probably would have contracted had contracting been feasible in

the circumstances, which it was not. A quasi-contract must not be confused with a "contract implied in fact," which is a contract "in which behavior takes the place of articulate acceptance." *Brines v. XTRA Corp.*, 304 F.3d 699, 703 (7th Cir. 2002); see also *Theuerkauf v. Sutton*, 306 N.W.2d 651, 657-58 (Wis. 1981); *Schwartz v. Federated Realty Group, Inc.*, 436 N.W.2d 34, 36 (Wis. App. 1988); E. Allan Farnsworth, *Contracts* § 3.10 (4th ed. 2004). A "contract implied in fact" is thus a species of express contract, *Schwartz v. Federated Realty Group, Inc., supra*, 436 N.W.2d at 36 n. 2, rather than one constructed by the court.

Similar to quasi-contract is "quantum meruit," which means suing for the value of a service rendered under circumstances in which payment was reasonably expected but the parties' contract was unenforceable, for example because it did not comply with the statute of frauds. *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005). In both the physician case (quasi-contract) and the statute of frauds case (quantum meruit), the plaintiff is entitled to the market value of his services rather than to the benefit that he conferred on the defendant, which might be much greater—for example if the plaintiff physician had saved the defendant's life. The court tries to simulate a competitive market; and in such a market, price is based on the cost to the seller rather than on the subjective value to the buyer, which often is much greater. But the benefit received by the defendant is the proper measure of relief when he has appropriated something of value belonging to the plaintiff. On the distinction, see *Ramsey v. Ellis*, 484 N.W.2d 331, 333-34 (Wis. 1992).

These interlocked, in some cases identical, theories of recovery have no application to this case. Firms con-

stantly disseminate information without expectation of payment. It would be ridiculous to think that ConFold could simply have mailed its container design to every company in the world that uses containers and then gone around and sued all the companies that used the design. It is different if the design is patented or the recipient agrees not to use it, but then (since there is no patent claim here, although there is indeed such an animal as a design patent—as will turn out to be relevant to our analysis) we are back to the contract claim that the district judge properly rejected.

With the terms "trade secrets" and "misappropriation" we come at last to the issue that seems to divide Wisconsin and Minnesota but probably does not. ConFold believes mistakenly that a trade secret is a property right in the same sense in which a person has a property right in his mattress. A property right in the latter sense is a right good against the whole world, which a trade secret is not, because it is perfectly lawful to "steal" a firm's trade secret by reverse engineering. *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 155-56 (1989); *Rockwell Graphic Systems, Inc. v. DEV Industries, Inc.*, 925 F.2d 174, 179 (7th Cir. 1991); *American Can Co. v. Mansukhani*, 742 F.2d 314, 334 n. 24 (7th Cir. 1984) (Wisconsin law). In contrast, a patent right is good against the whole world. A copyright is not because independent discovery is a defense to a copyright—or a trade secret—claim; it is not a defense to a patent claim. But a copyright is a fuller property right than a trade secret, because copying is infringement; copying a trade secret, which is what reverse engineering does, is not.

A trade secret is really just a piece of information (such as a customer list, or a method of production, or a secret formula for a soft drink) that the holder tries to keep secret by executing confidentiality agreements

with employees and others and by hiding the information from outsiders by means of fences, safes, encryption, and other means of concealment, so that the only way the secret can be unmasked is by a breach of contract or a tort. Wis. Stat. § 134.90(2)(c); *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 721-23 (7th Cir. 2003); *Mangren Research & Development Corp. v. National Chemical Co.*, 87 F.3d 937, 942-43 (7th Cir. 1996). ConFold admits that its designs were not trade secrets.

In general, if information is not a trade secret and is not protected by patent, copyright, or some other body of law that creates a broader intellectual property right than trade secrecy does, anyone is free to use the information without liability. ConFold argues, however, that the common law of Minnesota imposes liability for such use if the defendant got hold of the information improperly. The argument is difficult to understand; if the information is not secret and not protected by any of the laws that create property rights in information, it is in the public domain and freely usable without need to commit a tort or a breach of contract to obtain it.

The cases on which ConFold relies—the *Rehabilitation Specialists*, *Tate*, and *Micro Display Systems* cases cited earlier—stand for the distinct proposition that while section 7(a) of the Uniform Trade Secrets Act (in force in Wisconsin, Wis. Stat. § 134.90(6)(a)) preempts most non-UTSA remedies for misappropriation of a trade secret, the victim can sue separately for a tort committed in the course of the misappropriation, such as a trespass. See also *Frantz v. Johnson*, 999 P.2d 351, 358 (Nev. 2000). The proposition is controversial. It sounds like an end run around preemption, since misappropriation of a trade secret normally is not actionable without either a tort or a breach of contract, and the UTSA

already exempts (in section 7(b)(1)) claims of breach of contract from being preempted. Robert Unikel, "Bridging the 'Trade Secret' Gap: Protecting 'Confidential Information' Not Rising to the Level of Trade Secrets," 29 *Loy. U. Chi. L.J.* 841, 887-88 (1998). At all events, with the contract issue resolved in Polaris's favor, no contention that it obtained ConFold's designs by tortious means, and no trade secrets, ConFold can get no traction from the Minnesota cases.

There is, however, another version of "misappropriation," unrelated to trade secrets, which ironically has a footing in Wisconsin law, see *Mercury Record Productions, Inc. v. Economic Consultants, Inc.*, 218 N.W.2d 705, 709-11 (Wis. 1974); see generally *McKevitt v. Pallasch*, 339 F.3d 530, 533-35 (7th Cir. 2003), but has never been mentioned in a Minnesota case (and remember that ConFold is contending that Minnesota law governs its misappropriation claim), on which ConFold might have tried to rely, though with dim prospects of success.

*International News Service v. Associated Press*, 248 U.S. 215 (1918), a decision no longer authoritative because it was based on the federal courts' subsequently abandoned authority to formulate common law principles in suits arising under state law though litigated in federal court, has inspired the common law of a number of states, including, it seems, Wisconsin. The Associated Press and the International News Service competed in gathering news to be published in newspapers. Barred during much of World War I by British and French censors from sending war dispatches to the United States, INS would paraphrase AP's war dispatches that had been published in east coast newspapers, and it was able to publish its paraphrases in west coast newspapers at the same hour because of the difference in time zones and in east coast newspapers only a few hours later. There was no copyright infringement,

because INS was copying the facts reported in AP's dispatches rather than the dispatches themselves and anyway AP had not bothered to copyright its dispatches. And of course there was no trade secrecy. Nevertheless the Court held that AP was entitled to enjoin INS's copying as a form of unfair competition.

In an effort to keep this concept of unfair competition or misappropriation—this bequest by the Supreme Court to a number of states—within reasonable limits, the Second Circuit, in an influential opinion interpreting New York law, stated the elements of the tort as follows: "(i) the plaintiff generates or collects information at some cost or expense; (ii) the value of the information is highly time-sensitive; (iii) the defendant's use of the information constitutes free-riding on the plaintiff's costly efforts to generate or collect it; (iv) the defendant's use of the information is in direct competition with a product or service offered by the plaintiff; (v) the ability of other parties to free-ride on the efforts of the plaintiff would so reduce the incentive to produce the product or service that its existence or quality could be substantially threatened." *National Basketball Association v. Motorola, Inc.*, 105 F.3d 841, 852 (2d Cir. 1997) (citations omitted). ConFold has made no effort to establish these elements. Its misappropriation claim comes down to a claim of infringement of a design that it did not patent. Such a claim is preempted by patent law, as held by the Supreme Court in the *Bonito* case cited earlier. See also *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 231-32 (1964); *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234, 239 (1964). The broader, *INS*-type claim probably is not preempted, see *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, *supra*, 489 U.S. at 154, but, as we have just noted, its elements have not been proved.

AFFIRMED.

No. 05-1285                                                          15

A true Copy:

    Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
