In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 07-1823

INDIANA LUMBERMENS MUTUAL INSURANCE COMPANY,

*Plaintiff-Appellee*,

*v.*

REINSURANCE RESULTS, INC.,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 05-CV-683—**Larry J. McKinney**, *Judge*.

———————

ARGUED DECEMBER 7, 2007—DECIDED JANUARY 16, 2008

———————

Before POSNER, ROVNER, and WILLIAMS, *Circuit Judges*.

POSNER, *Circuit Judge*. The defendant in this diversity suit for breach of contract governed by Indiana law appeals from the grant of summary judgment in favor of the plaintiff. The case turns on the interpretation of a contract between an insurance company, Lumbermens Mutual, the plaintiff, and Reinsurance Results, the defendant, which reviews an insurance company's claims against its reinsurers to make sure the insurance company receives the benefits to which its reinsurance contracts entitle it. We'll sometimes call Lumbermens the

"insurance company" and we'll call Reinsurance Results the "service company."

The contract is very short and its key language shorter still. The service company undertakes to review the insurance company's claims and to report any "premium and/or claims identified during the course of the review that have not been processed in accordance with the reinsurance contract terms and conditions." The fee for this service is 33 percent of the " 'Net Funds' collected from [the insurance company's] reinsurers as a result of this review." The service company claims that it obtained net funds of $2.2 million for its client and thus is owed 33 percent of that amount. The insurance company, disagreeing, brought this declaratory judgment action, contending that it owes the service company nothing, and won.

Reinsurance is a dauntingly complex, esoteric field of business and the briefs in this case are correspondingly complex and esoteric. But the facts relevant to the appeal are actually rather simple, and the forbidding jargon of reinsurance ("ceded unearned premium," "aggregate excess of loss," "under-ceded reinsurance loss," "reinsurance treaty," and the rest) can be dispensed with. An insurance company—which is to the reinsurer as an insured is to the insurance company—pays premiums for reinsurance. Until 2000, Lumbermens expensed the entire premium cost of its reinsurance policies in the calendar year in which it bought them. That year, with the approval of its auditor, PricewaterhouseCoopers (PwC), it changed its accounting method as follows. It divided the premium by the number of years of coverage that it had brought, and treated each year's share of the premium as an expense in that year. It then reclassi-

fied the premium—which it had already paid, for coverage over the life of the policy—as a prepayment of future expenses and thus as a capital asset (like a reserve for a tenant who pays a year's worth of rent in advance) to be amortized over its useful life (the period of coverage). By thus increasing the assets reflected on its books of account, Lumbermens increased the amount of surplus shown on the books.

The accounting change affected the amount that Lumbermens could bill its reinsurers for losses covered by its reinsurance policies. This will take some explaining. There are tiers of reinsurance coverage, just as there are tiers of insurance coverage. Assume, to keep things simple, that there are only two reinsurance tiers, with the first covering losses up to some specified amount and the second losses above that limit. (That is the equivalent of primary and secondary coverage in an ordinary insurance contract.) If a loss above the first reinsurer's limit occurs, the insured (that is, the insurance company, Lumbermens in our case) bills it for the loss. But the net recovery by the insurance company is the reimbursement for the loss minus the premium it paid for the coverage. The loss above the first reinsurer's loss limit is reimbursed by the second reinsurer, but—and this is the key to understanding this case—the premium that the second reinsurer charges is based on the net reimbursement to the insurance company by the first reinsurer and thus on the loss up to the first reinsurer's loss limit minus the premium paid to that reinsurer. So if, for example, the loss to be reinsured against is $20 million, the loss limit of the first reinsurer $10 million, and the premium paid to the first reinsurer $1 million (10 percent of the policy limit), the second reinsurer, which makes

good the difference between the $20 million loss and the $10 million paid by the first reinsurer, will base its premium (which let's suppose is also 10 percent) on the difference between the first reinsurer's loss limit and that reinsurer's premium. That difference in our example is $9 million ($10 million – $1 million), and so the second reinsurer's premium is $900,000 rather than $1 million; if instead the second reinsurer charged the insurance company $1 million, the company would therefore be entitled to a refund of $100,000.

But when in 2000 Lumbermens changed its accounting method, no longer, when it submitted a claim to the second reinsurer, would it deduct the premium to the first insurer, though it had paid it, because on its books it had deferred that premium expense, and its contracts with the reinsurers based premiums on book values rather than cash flow. The amounts deferred must have exceeded the higher premiums paid the second-tier reinsurers, so that the accounting change increased the company's surplus; otherwise the company would not have made the change. But why would an insurance company trade higher book value (another term for surplus) for a lower cash flow? The answer appears to be that the number of policies an insurer is permitted by its regulators to write, and therefore the amount of premiums that it can collect, is proportional to its surplus. So Lumbermens may have traded higher premium revenue for lower reimbursements from its reinsurers without abandoning its business common sense. And the fact that an insurance company's ability to write policies is tethered to the surplus shown on its books may explain why reinsurers base their premiums on the company's accounting classifications. The more policies an insurer writes, the more likely it is that one of its policy holders

will incur a loss that triggers the reinsurer's liability to the insurance company. To compensate for this elevated risk, the prudent reinsurer demands a higher premium, which takes the form of a delayed reimbursement to the insurer. The insurer gets to write additional policies, and during the interval when the insurer's surplus is inflated by its method of accounting, the reinsurer enjoys the time value of money reimbursed at a later date.

Lumbermens' contract with the service company went into effect in November of 2004. A few days later the company sent Lumbermens a memo noting the 2000 accounting change and suggesting that it was improper. The insurance company checked with PwC, which advised the insurance company, on the basis of a change that had been made in the National Association of Insurance Commissioners' Statement of Statutory Accounting Procedure 62, to revert to its pre-2000 accounting practice. It did so, and this required it to reduce the net surplus carried on its books by $829,000. It billed the second- (and higher-) tier reinsurance companies for the premium overpayments that it had incurred by virtue of not deducting the lower-tier reinsurers' premiums when it had paid them. The reinsurance companies paid what the insurance company said they owed it and that is the $2.2 million of which the service company claims to be owed a third.

The insurance company argues that the receipt of the $2.2 million from the reinsurers was not a benefit to the company. It *wanted* to defer the receipt of that money from its reinsurers in order to augment its surplus because it thought the profits derived from the additional policies that it would be able to write as a result of having a higher surplus would exceed the premium over-

payments. If this is right, the service company did Lumbermens no favor by causing it to return to the old method.

The argument is not necessarily wrong, though it is speculative. The insurance company's accounting method was questionable (or so at least PwC advised it), and continued adherence to it might have gotten it into trouble with the insurance regulators. They do not like insurance companies to use questionable accounting methods to jack up their surpluses, since overstating the company's assets and thus the amount of insurance that it may write increases the risk of default. Sooner or later, then, the company would probably have had to go back to its old method of accounting for reinsurance premiums. And by then, the service company argues, it might have been too late for the insurance company to be able to collect the money (the excess premiums) owed it by the upper-tier reinsurers. This, however, is unlikely. The insurance company would not have wanted to defer receipt of the money owed it by its reinsurers to a point at which the money might become uncollectible. And it did not; rather than deferring receipt indefinitely, as the service company's argument implies, it deferred it just till the reinsurance policy expired, at which point its prepayment asset would have been fully depreciated.

The service company's better argument is that by causing the insurance company to check with PwC and as a result revert to its old accounting practice, it saved the insurance company from a possible tiff with its regulators—though the service company's lawyer acknowledged at argument that the regulators might not have noticed the accounting irregularity, or if it did notice them, care.

We defer for the moment further discussion of the benefit, if any, conferred on the insurance company by the service company to consider whether, if a benefit was conferred, the conferral was pursuant to the contract. It was not. The contract, drafted by the service company's chief executive officer, is specific and clear; and were it unclear, any ambiguity would have to be resolved against the service company because it drafted the contract. Indiana applies this rule of contract interpretation, rightly or, as might be argued, wrongly, *Farmers Automobile Ins. Ass'n v. St. Paul Mercury Ins. Co.*, 482 F.3d 976, 977 (7th Cir. 2007)—but that is none of our business in a case governed by Indiana law—even when the other party to the contract is, as in this case, commercially sophisticated. E.g., *Cinergy Corp. v. Associated Electric & Gas Ins. Services, Ltd.*, 865 N.E.2d 571, 574-77 (Ind. 2007); *Trustcorp Mortgage Co. v. Metro Mortgage Co.*, 867 N.E.2d 203, 213-16 (Ind. App. 2007); *Liberty Ins. Corp. v. Ferguson Steel Co.*, 812 N.E.2d 228, 230 (Ind. App. 2004).

The contract states that the service company is to report any loss or premium-overpayment claims, discovered during the course of its review of the insurance company's reinsurance contracts, "that have not been processed *in accordance with the reinsurance contract terms and conditions*" (emphasis added). The claims that the insurance company submitted to its reinsurers were correctly processed. Nothing in the terms of its reinsurance contracts requires it to use one method of accounting rather than another. The decision first to defer reporting to the upper-tier reinsurers the premiums paid to the lower-tier reinsurers and then, four years later, to bill them for the premiums it had overpaid, because PwC told it that deferring the reporting of the premiums

was a violation of accounting standards, was a decision internal to the insurance company; it had nothing to do with the terms of the reinsurance contracts. Had the service company discovered that a term of one of those contracts entitled the insurance company to coverage for a loss that it had experienced but for which it had not submitted a claim, then the service company would be entitled to 33 percent of the amount of the claim when the insurance company billed and received it. But that is not what happened. The service company's discovery of the 2000 accounting maneuver and its recommendation that the insurance company abandon it *may* have benefited the company. But it was not a benefit for which the insurance company was contractually obligated to compensate the service company.

One who voluntarily confers a benefit on another, which is to say in the absence of a contractual obligation to do so, ordinarily has no legal claim to be compensated. E.g., *In re Grabill Corp.*, 983 F.2d 773, 776 (7th Cir. 1993); American Law Institute, *Restatement (First) of Restitution* § 2 (1937). If while you are sitting on your porch sipping Margaritas a trio of itinerant musicians serenades you with mandolin, lute, and hautboy, you have no obligation, in the absence of a contract, to pay them for their performance no matter how much you enjoyed it; and likewise if they were gardeners whom you had hired and on a break from their gardening they took up their musical instruments to serenade you. When voluntary transactions are feasible (in economic parlance, when transaction costs are low), it is better and cheaper to require the parties to make their own terms than for a court to try to fix them—better and cheaper that the musicians should negotiate a price with you in advance

than for them to go running to court for a judicial determination of the just price for their performance. In contrast, "when a businessman renders a valuable service in circumstances in which compensation would normally be expected, and though he is acting without the knowledge or consent of the recipient of the service there is no alternative because transacting with the owner would be infeasible (maybe the owner can't be located), an award of compensation is appropriate to encourage a valuable activity." *Nadalin v. Automobile Recovery Bureau, Inc.*, 169 F.3d 1084, 1086 (7th Cir. 1999). That is the case of prohibitively high transaction costs. This is not such a case.

Another inapplicable exception to the law's hands-off approach comes into play when the party rendering the service reasonably expects to be paid for it though he has no contractual entitlement. E.g., *Olsson v. Moore*, 590 N.E.2d 160, 163 (Ind. App. 1992). There might be a contract but it might be unenforceable because it violated the statute of frauds, yet thinking it enforceable the performing party had performed his (reasonably, but incorrectly, supposed) obligations under the contract and now seeks compensation. He would not be entitled to the contract price, because the contract was unenforceable, but he would be entitled to the market value of his performance. *Wallace v. Long*, 5 N.E. 666, 668-69 (Ind. 1886); *Mueller v. Karns*, 873 N.E.2d 652, 658-59 (Ind. App. 2007); *Scheiber v. Dolby Laboratories, Inc.*, 293 F.3d 1014, 1022-23 (7th Cir. 2002) (Indiana Law); *ConFold Pacific, Inc. v. Polaris Industries, Inc.*, 433 F.3d 952, 957-58 (7th Cir. 2006).

The doctrine that allows this is quantum meruit, a branch of the law of restitution, having roots in equitable notions; and the service company advanced a claim for compensation under it in the district court. The court

rejected the quantum meruit claim, and the company has abandoned the claim on appeal—wisely. The service company did not render a service pursuant to an unenforceable contract; it rendered a service outside the contract, as we have seen. When parties have a valid contract, there is no bargaining failure that would justify a court's awarding a party more than he had contracted for. As we noted in *Industrial Dredging & Engineering Corp. v. Southern Indiana Gas & Electric Co.*, 840 F.2d 523, 525 (7th Cir. 1988) (citations omitted), "Indiana appellate courts have uniformly held that 'the existence of a valid express contract for services . . . precludes implication of a contract covering the same subject matter. The rights of the parties are controlled by the contract and under such circumstances recovery cannot be had on the theory of quantum meruit.' " See, e.g., *Milwaukee Guardian Ins., Inc. v. Reichhart*, 479 N.E.2d 1340, 1343-44 (Ind. App. 1985); see also *Goldstick v. ICM Realty*, 788 F.2d 456, 466-67 (7th Cir. 1986).

The result may seem harsh, but we will be able to see the sense behind it by resuming our discussion of whether the service company actually conferred a benefit on the insurance company. We said that it may have done so, but we said nothing about the size of the benefit. It is most unlikely that the $2.2 million that the insurance company received from its reinsurers as a result of the service company's tip was a net benefit to the insurance company. The company wanted to defer receipt of the money, and would probably have gone on doing just that, for a time anyway, had it not been induced by the service company to seek the advice of its auditor, from whom it learned the bad news. By continuing, the insurance company might have gotten into hot water with its

regulators, but perhaps not—so could a court compute the benefit that the tip had conferred?

Nor is benefit conferred the usual measure of market value, which is the value that courts use to calculate the relief due a plaintiff whose claim of quantum meruit succeeds. *In re Carroll's Estate*, 436 N.E.2d 864, 866 (Ind. App. 1982); *ConFold Pacific, Inc. v. Polaris Industries, Inc.*, *supra*, 433 F.3d at 958. In a competitive market, price tends to be driven down to or at least near cost; it is under monopoly conditions that sellers are able to appropriate what economists call "consumer surplus"—the difference between the value of a good or service to a consumer (in the sense of the highest price he could be made to pay for it—his "reservation price") and the market price. If an airline ticket costs $100, but you would be willing, if pushed, to pay up to $300 for it, you derive $200 in consumer surplus from the transaction. Obviously this does not mean that if your travel agent obtains the ticket for you, he will charge you $300. Travel agents nowadays do often charge ticketing fees, but they are modest, reflecting competitive pressures. It is no surprise that when courts award quantum meruit they base the award on the market price of the good or service in question. There is no market price for the extracontractual "service" that the service company rendered the insurance company.

The service company might have drafted the contract that it submitted to the insurance company more broadly—might have inserted a provision entitling the service company to be compensated for any advice it gave the insurance company that the latter took. But the insurance company might well have balked at such a demand, as vistas of contention over benefits conferred opened up before it. So the service company really is seeking more than it bargained to receive.

A note, finally, on advocacy in this court. The lawyers' oral arguments were excellent. But their briefs, although well written and professionally competent, were difficult for us judges to understand because of the density of the reinsurance jargon in them. There is nothing wrong with a specialized vocabulary—for use by specialists. Federal district and circuit judges, however, with the partial exception of the judges of the court of appeals for the Federal Circuit (which is semi-specialized), are generalists. We hear very few cases involving reinsurance, and cannot possibly achieve expertise in reinsurance practices except by the happenstance of having practiced in that area before becoming a judge, as none of us has. Lawyers should understand the judges' limited knowledge of specialized fields and choose their vocabulary accordingly. Every esoteric term used by the reinsurance industry has a counterpart in ordinary English, as we hope this opinion has demonstrated. The able lawyers who briefed and argued this case could have saved us some work and presented their positions more effectively had they done the translations from reinsurancese into everyday English themselves.

AFFIRMED.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*