**COURT OF APPEALS
DECISION
DATED AND FILED**

**January 28, 2021**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.     2020AP286-CR**

**STATE OF WISCONSIN**

Cir. Ct. No. 2018CF1001

**IN COURT OF APPEALS
DISTRICT IV**

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

V.

SHONDRELL R. EVANS,

   DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Dane County: SUSAN M. CRAWFORD, Judge. *Reversed and cause remanded for further proceedings.*

Before Fitzpatrick, P.J., Blanchard, and Kloppenburg, JJ.

¶1     KLOPPENBURG, J.  Shondrell Evans pleaded guilty to possession of a firearm as a felon after the circuit court denied his motion to suppress evidence.  Evans argued that he was entitled to suppression because the evidence

was obtained through an unconstitutional seizure in violation of his Fourth Amendment right to be secure against such a seizure. Evans renews his argument in appealing the circuit court's denial of his motion.

¶2 Early on a March morning, two police officers in marked squad cars approached Evans, who was sitting in the driver's seat of a vehicle parked in a hotel parking lot. The two squad cars simultaneously converged on Evans's vehicle from either side, one perpendicular to and pointed directly at the vehicle's driver's side, and the other pointed diagonally to the rear of the vehicle's passenger's side. This resulted in Evans's vehicle being blocked in on three sides in a pincer-like fashion and Evans having no opportunity to exit the parking lot except by putting his vehicle in reverse and then backing up and maneuvering between and around the squad cars. The officers shined both their headlights and overhead spotlights on Evans's vehicle.

¶3 The officers subsequently approached Evans's vehicle on foot, smelled marijuana, and conducted a search of the vehicle. In this search, they found a firearm that led to Evans's charging and plea. The issues on appeal are whether the officers seized Evans within the meaning of the Fourth Amendment when they used their squad cars to flank Evans's vehicle and trained their spotlights on him before they exited the squad cars and smelled marijuana, and, if so, whether the seizure was supported by reasonable suspicion or otherwise justified under the Fourth Amendment. Because we conclude that the officers seized Evans before they exited their squad cars and lacked reasonable suspicion or other recognized constitutional basis to effectuate this seizure, we reverse the judgment of the circuit court and remand the cause for further proceedings.

# BACKGROUND

¶4       The following pertinent facts are undisputed.  At approximately 2:30 in the morning on March 8, 2018, Town of Madison police officer Logan Brown was on patrol near the Clarion Suites Hotel on Rimrock Road.  He saw a man later identified as Evans and a woman leave the hotel, enter a vehicle, and exit the hotel parking lot.  Officer Brown followed the vehicle.  Evans and his companion drove to the parking lot of a nearby apartment complex, parked there for about a minute, then returned to the hotel parking lot.

¶5       When Evans returned to the hotel parking lot, he parked his vehicle so that it was facing a concrete barrier and alongside another car, which was parked on the passenger's side of Evans's vehicle.  Evans and his companion stayed in the parked vehicle after returning to the hotel parking lot.

¶6       After several minutes passed, Officer Brown decided to make contact with Evans's vehicle.  Officer Brown called Officer Hoffman, who was in another squad car nearby.  The two officers approached Evans's vehicle in their squad cars at the same time.

¶7       Officer Brown pulled his squad car to within a few feet (less than the width of one parking space) of Evans's vehicle, perpendicular to it and across multiple marked parking spaces, so that the front of his squad car was pointed directly at the driver's side door of Evans's vehicle.[1]  At the same time, Officer

---

[1] The facts as to the positioning of the squad cars are taken from uncontested testimony at the suppression hearing and one photograph, reproduced in Evans's appellate briefing, taken from body and squad car videos shown at the hearing.  The DVD in the record purportedly containing those videos is blank, and the circuit court does not possess a DVD with the videos.

Hoffman pulled his squad car similarly close (less than the width of one parking space) to Evans's vehicle. Officer Hoffman testified that the front of his squad car pointed "at approximately a 45-degree angle off the rear bumper" of the passenger's side of Evans's vehicle. Thus, after the two squad cars suddenly converged on him, Evans's vehicle was blocked in front by the concrete barrier, on the driver's side by Officer Brown's squad car, and on the passenger's side by the other parked car, with Officer Hoffman's squad car placed diagonally a few feet to the rear of Evans's vehicle slightly off to the passenger side. Despite the two flanking squad cars, Evans's vehicle was not physically blocked directly to the rear, because neither squad car directly physically blocked reversal by Evans. Thus, although Evans's vehicle was physically blocked on three sides, it would have been physically possible for him to leave by placing his car in reverse and proceeding in reverse between and around the two squad cars and then driving out of the parking lot.

¶8 Both officers had their car headlights on and trained overhead spotlights on Evans's vehicle. The officers did not activate any other lights or sound-making devices.

¶9 At the same time, the officers got out of their cars and walked toward Evans's vehicle. Before reaching the vehicle, both officers noticed the smell of marijuana. When Officer Brown arrived at Evans's window, he had Evans get out of the vehicle, and the two officers searched it. In this search, they found a firearm, which led to Evans's arrest.

¶10 Evans moved to suppress the firearm, arguing that it was the result of an illegal seizure. The circuit court noted that, although Evans's vehicle was blocked on three sides, "the squad vehicles were not parked so close or positioned

in such a way that he [would have been] unable to back out" and then proceed out of the lot. The court denied the suppression motion, determining that Evans was not seized until the officers began questioning him, at which point they smelled marijuana and had probable cause to arrest him. The court also determined that, even if Evans was seized at the point that the squad cars flanked his vehicle and trained their spotlights on it, the seizure was reasonable "based on the officer's observations of the individuals coming and going at that hour from the hotel parking lot in a way that seemed unusual and not explainable in a high crime area." Evans pleaded guilty to possession of a firearm as a felon and was sentenced. He now appeals the circuit court's denial of his motion to suppress. We provide additional pertinent facts in the discussion that follows.

## DISCUSSION

¶11    We first explain the standard governing our review of the circuit court's decision on a motion to suppress evidence. We next explain why we conclude that: (1) Evans was subject to a Fourth Amendment seizure when his vehicle was simultaneously flanked and spotlighted by the two officers' squad cars, one of which pulled up perpendicular to and was pointed directly at the driver's side of Evans's vehicle and the other of which was pointed diagonally at the rear passenger's side of the vehicle; and (2) the seizure was not supported by reasonable suspicion or otherwise justified under the Fourth Amendment.

### I.  Standard of Review

¶12    An appellate court reviews a motion to suppress under a two-step analysis. *State v. Eason*, 2001 WI 98, ¶9, 245 Wis. 2d 206, 629 N.W.2d 625. First, we review the circuit court's findings of fact, which we uphold unless they are clearly erroneous; second, we review the application of constitutional

principles to those facts de novo. *State v. Felix*, 2012 WI 36, ¶22, 339 Wis. 2d 670, 811 N.W.2d 775; *County of Grant v. Vogt*, 2014 WI 76, ¶17, 356 Wis. 2d 343, 850 N.W.2d 253. We determine independently whether and when a seizure occurred for purposes of the Fourth Amendment. *State v. Young*, 2006 WI 98, ¶17, 294 Wis. 2d 1, 717 N.W.2d 729. Likewise, whether a seizure is reasonable is a constitutional question of fact to which we apply the same two-step standard of review. *State v. Knapp*, 2005 WI 127, ¶19, 285 Wis. 2d 86, 700 N.W.2d 899.

## II. Seizure

¶13 We first summarize the applicable legal principles governing seizure under the Fourth Amendment. We next apply those principles to the undisputed facts here and conclude that Evans was seized when the two officers used their vehicles to flank Evans's vehicle in what amounted to a pincer-like formation, with one them pointed directly at the driver's seat of his vehicle, and directed their spotlights at him.

¶14 The Fourth Amendment of the United States Constitution and article I, section 11 of the Wisconsin Constitution protect the right to be free from unreasonable searches and seizures. *Young*, 294 Wis. 2d 1, ¶18. Wisconsin courts generally construe our state constitutional protections in the same way that the United States Supreme Court has interpreted the Fourth Amendment. *Id.*, ¶30. Evidence obtained through unconstitutional searches and seizures is generally suppressed under the exclusionary rule, with the purpose of deterring Fourth Amendment violations. *State v. Dearborn*, 2010 WI 84, ¶35, 372 Wis. 2d 252, 786 N.W. 2d 97.

¶15 "[A] person has been seized within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a

reasonable person would have believed that he [or she] was not free to leave." *Vogt*, 356 Wis. 2d 343, ¶20 (internal quotation marks and citation omitted). So long as a person interacting with police "remains free to … walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *Vogt*, 356 Wis. 2d 343, ¶25 (quoting *Mendenhall*, 446 U.S. at 554). The test of whether a person is free to leave is objective and "considers whether an innocent reasonable person, rather than the specific defendant, would feel free to leave under the circumstances." *Vogt*, 356 Wis. 2d 343, ¶¶25, 30.

¶16 A seizure may be effectuated "by means of physical force or show of authority." *Vogt*, 356 Wis. 2d 343, ¶20 (quoting *Mendenhall*, 446 U.S. at 552). To effectuate a seizure without the use of physical force, "an officer must make a show of authority, and the citizen must actually yield to that show of authority."[2] *Kelsey C.R. v. Kelsey C.R.*, 2001 WI 54, ¶33, 243 Wis. 2d 422, 626 N.W.2d 777. "Yet, not every display of police authority rises to a 'show of authority' that constitutes a seizure." *Young*, 294 Wis. 2d 1, ¶65. "A police officer's actions must be assessed in view of all the circumstances surrounding the incident" to determine if the actions would "cause a reasonable person to believe that he [or she] was not free to leave." *Id.*

¶17 Pertinent here, the courts have considered whether parking a squad car so as to block the movement of a vehicle may rise to a "show of authority" that

---

[2] The State here does not dispute that, to the extent there was a show of authority, Evans yielded to it.

constitutes a seizure. Numerous federal courts have found that blocking the movement of a vehicle may be a seizure, even if the car is not wholly blocked from leaving. *See, e.g.*, ***United States v. Tuley***, 161 F.3d 513, 514 (8th Cir. 1998) (seizure occurred where officer parked squad car behind an individual's truck that was blocked in the front by an awning); ***United States v. Burton***, 441 F.3d 509, 510 (7th Cir. 2006) (seizure occurred where officers on bicycles blocked three sides of car); ***United States v. Gross***, 662 F.3d 393, 399 (6th Cir. 2011) (seizure occurred where officer parked squad car in front of individual's car that was backed into a parking space, such that the car could not exit).[3] On the other hand, situations in which police leave a clear path for egress are less likely to constitute seizure. *See, e.g.*, ***United States v. Ringold***, 335 F.3d 1168, 1173 (10th Cir. 2003) (no seizure occurred when officer parked at an angle next to individual's vehicle because "nothing prevented" the individual from "simply entering his vehicle and

---

[3] The dissent contends that the reasoning in these cases is unpersuasive because the cases do not "discuss situations in which a vehicle is not blocked in every direction from leaving." Dissent at ¶71. However, federal courts have held that even partially blocking a defendant's exit can be an important signal of police authority, particularly when the partial block occurs from multiple directions and at close quarters. "[O]ur case law makes clear that officers need not totally restrict a citizen's freedom of movement in order to convey the message that walking away is not an option." ***United States v. Smith***, 794 F.3d 681, 686 (7th Cir. 2015). Examples include ***United States v. Burton***, 441 F.3d 509, 510-11 (7th Cir. 2006) (seizure when police blocked defendant on three sides); ***United States v. Pavelski***, 789 F.2d 485, 488-89 (7th Cir. 1986) (holding that suspect was not seized when police parked behind and on one side of his car but was seized when police blocked suspect's car on third side) ("A reasonable person in this situation, bounded on three sides by police patrol cars, would not have believed that he was free to leave."); ***United States v. Packer***, 15 F.3d 654, 657 (7th Cir. 1994) (officers effected seizure when they parked in front of and behind suspect's car and shined "takedown" light [spotlight] through defendant's windows); ***United States v. Kerr***, 817 F.2d 1384, 1387 (9th Cir. 1987) (when police vehicle partially blocked one-lane driveway, it "defies common sense" to suggest that the defendant could have simply backed around the police vehicle because defendant reasonably perceived that he was not free to leave); *cf.*, ***United States v. Douglass***, 467 F.3d 621, 624 (7th Cir. 2006) (no seizure when squad car parked twenty feet away from defendant's vehicle and defendant "was not blocked on three sides, or even two") (citing cases in which blocking on two and three sides was found to be seizure).

driving away"); ***United States v. Carr***, 674 F.3d 570, 573 (6th Cir. 2012) (no seizure occurred when officer parked police vehicle in such a way that individual had "sufficient room to drive either forward or backward").

¶18    Our supreme court, examining the question of seizure in ***Vogt***, concluded that, although it was a "close case," an individual was not seized when a single squad car was parked behind his vehicle, obstacles were present on two other sides of the vehicle, and the officer rapped on the individual's window, because the individual "still could have driven away" and "had room to leave." ***Vogt***, 356 Wis. 2d 343, ¶¶41, 54.

¶19    Also pertinent here, the use of a squad car's spotlight is a show of authority that may, in combination with other circumstances, suffice to effectuate a seizure. *See **United States v. Johnson***, 874 F.3d 571, 574 (7th Cir. 2017) (seizure occurred when two squad cars drew up parallel to and behind defendant's car and shined spotlights on the car, thus "impl[ying] that the occupants were not free to drive away"). Under Wisconsin case law, a police spotlight is one "indici[um] of police authority" but by itself does not necessarily rise to a "'show of authority' that constitutes a seizure." ***Young***, 294 Wis. 2d 1, ¶65. Our supreme court observed in ***Young*** that it was "reluctant" to conclude that a seizure occurred when a squad car parked behind an individual's vehicle and lit the vehicle with a spotlight, although the court did not make a determination on that point. ***Young***, 294 Wis. 2d 1, ¶69.

¶20    Here, there is no doubt that the simultaneous positioning of the two squad cars in a flanking maneuver, with one squad car having pulled up perpendicular to Evans's vehicle across several parking spaces and pointed directly at the driver's side of his vehicle, combined with the use of spotlights,

present "indicia of police authority." *Young*, 294 Wis. 2d 1, ¶65. We must decide whether, "in view of all the circumstances surrounding the incident," they rise to a "show of authority" that would make a reasonable person in Evans's position at the moment believe that he was not free to leave, and therefore constitute a seizure. *Id.*

¶21 Evans argues that the positions of the two squad cars, one having pulled up across several parking spaces perpendicular to and pointed directly at Evans in the driver's seat and the other pointed diagonally at his vehicle's passenger's side to the rear, together created a situation in which Evans was required to put his vehicle in reverse and maneuver between and around them in order to leave. Combined with the overhead spotlights shining on his vehicle, he contends, this constituted a sufficient show of authority that a reasonable person in his position would not have felt free to leave. The State responds that a reasonable person in his position would have felt free to leave because the officers positioned their squad cars in such a way that he did have a path to exit the parking lot. We now explain why we agree with Evans.

¶22 To repeat, the circuit court found, consistent with the evidence as we have summarized it, that after the two squad cars converged on Evans and trained their spotlights on him, Evans could have put his vehicle in reverse and physically backed out through the space left by the squad cars and exited the parking lot. Thus, this situation is not analogous to one in which a vehicle literally cannot move freely and away from police due to the positioning of one or more police vehicles. However, as we now explain, it is also not analogous to the two principal Wisconsin cases briefly summarized above: *Vogt*, 356 Wis. 2d 343, ¶¶42, 54, the case on which the State relies, in which our supreme court concluded, in a "close" case, that there was no seizure because the defendant could

exit; and *Young*, in which the court intimated that it would be "reluctant" to find seizure because the positioning of the officer's car allowed the defendant to exit, *Young*, 294 Wis. 2d 1, ¶¶10, 69. While there are aspects of both cases that align with the circumstances here, there are significant differences that tip the scale in favor of the conclusion that, even though Evans had a method to exit, a reasonable person in the circumstances here would not feel free to use that method.

¶23 Significantly, unlike in either *Vogt* or *Young*, we have the compelling fact that Officer Brown did not merely pull up behind Evans's vehicle. In itself, a squad car pulling in across several parking spaces, both close and directly perpendicular to the driver's side of an occupied vehicle, sends a strong and unambiguous signal of authority. It is an "adversarial" move toward the vehicle that differs in kind from the officer's request to communicate in *Vogt*. *See Vogt*, 356 Wis. 2d 343, ¶3 (distinguishing an "adversarial" interaction with the "reasonable attempt to have a consensual conversation" by knocking on a car window). While the defendant in *Vogt* would have reasonably understood that the officer knocking on his window was merely "trying to make contact," 356 Wis. 2d 343, ¶43, Evans here would not have known what might happen next after seeing a squad car pull up across several parking spaces pointing directly at his window and another pull up not far from his right rear bumper. In addition, that perpendicular approach served as meaningful amplification of the message of police restraint signaled by the following additional facts not present in *Vogt* or *Young*.

¶24 Here, the officers used their two squad cars to flank Evans's vehicle, one pointed directly at his driver's side seat and one angled diagonally to the rear of his passenger's side, both positioned in what amounted to a pincer-like formation that was unmistakably focused on the occupants of his vehicle. In

11

contrast, in both *Vogt* and *Young*, only one squad car was parked behind the defendant's vehicle. *Young*, 294 Wis. 2d 1, ¶65; *Vogt*, 356 Wis. 2d 343, ¶53 (defendant "was not subject to the threatening presence of *multiple*" squad cars) (emphasis added).

¶25     Here, the only path of egress for Evans's vehicle would have been for him to put it in reverse and then attempt whatever reversing maneuver Evans believed would avoid hitting or coming too close to the squad car diagonally behind him. Leaving only this potential reverse between two squad cars does not resemble the situations in *Vogt* and *Young*, in which each defendant could have left by driving forward away from the single squad car. *Young*, 294 Wis. 2d 1, ¶10 (describing positioning of cars); *Vogt*, 356 Wis. 2d 343, ¶42 (video showed "ample room" for car to move forward).

¶26     In addition, Evans's vehicle was lit by two spotlights, rather than none as in *Vogt*, 356 Wis. 2d 343, ¶6, or one as in *Young*, 294 Wis. 2d 1, ¶10. The shining of spotlights from the two flanking squad cars here would have a measurably greater effect on a reasonable person, as a show of authority, than from one squad car. Moreover, the encounter in *Young* occurred on a busy road where the spotlight was necessary to alert passing motorists to the officer's car that was stopped in a traffic lane. *Young*, 294 Wis. 2d 1, ¶¶64, 66. This is in contrast to the case at bar, which occurred in a mostly empty parking lot. A reasonable person in Evans's position would have interpreted the unexpected, unexplained, simultaneous double spotlights, occurring in the small hours of the

morning, as a show of authority, given that the spotlights were not needed to warn passing motorists.[4]

¶27 For all these reasons, we conclude that if *Vogt* was "close" on the non-seizure side of the line, as our supreme court stated, then this case must fall on the seizure side of the line.

¶28 Although not binding on Wisconsin courts, Seventh Circuit cases that bear greater factual similarity to the situation here than Wisconsin authority are instructive. To repeat, in *Johnson*, the court determined that seizure occurred when two squad cars blocked the defendant's vehicle from two sides and both squad cars were shining spotlights into the defendant's car. *Johnson*, 874 F.3d at 574 ("two squad cars, which bathed the parked car in bright light, implied that the occupants were not free to drive away"). In *Burton*, the court considered it to be "a reasonable, in fact a compelling, inference that the police placed their bikes where they did [on three sides of the defendant's vehicle] in order to make sure

---

[4] The dissent contends that *Vogt* presents a more coercive set of facts than the case at bar because in *Vogt* there was a "personal, immediate interaction" between the officer and the defendant when the officer rapped on the defendant's window. Dissent at ¶89. However, the court in *Vogt* emphasized that such conduct was akin to an attempt to initiate a consensual conversation. *County of Grant v. Vogt*, 2014 WI 76, ¶¶7, 51, 356 Wis. 2d 343, 850 N.W.2d 253. As explained by a "leading commentator," *State v. Young*, 2006 WI 98, ¶59, 294 Wis. 2d 1, 717 N.W.2d 729, when police engage in some "action which one would not expect between two private citizens, such as boxing a car in, it is likely that the event will be considered a fourth amendment seizure." Wayne R. LaFave, Search and Seizure, a Treatise on the Fourth Amendment, § 9.2(h), at 416–17 (2nd ed. 1987). In *Vogt* the officer parked behind the defendant's car in such a way as to leave "ample room" for the car to move forward, turn around, and exit the parking lot, and the officer rapped on the window and motioned for the defendant to roll down the window, just as a concerned private citizen might do "to make contact" and initiate a consensual conversation. *Vogt*, 356 Wis. 2d 343, ¶¶3, 7, 42, 43. In contrast, the occupant of a parked car would not reasonably expect two private citizens to suddenly flank the car in a pincer-like formation such that the flanked car was blocked on three sides and one of the flanking cars is pointed directly at the driver, for other than "intimidating" purposes. *See id.*, ¶43 (circuit court found the officer's conduct "not so intimidating as to constitute a seizure").

13

that Burton didn't drive away before they satisfied themselves that there was no criminal activity afoot." **Burton**, 441 F.3d at 509. Although the court noted that the seizure was effectuated in "a severely attenuated sense," it nonetheless occurred because the defendant's vehicle was blocked on three sides, even though no spotlight was used. **Id.**[5]

¶29 The circumstances here present more indicia of restraint than either the Wisconsin cases or the Seventh Circuit cases because, unlike any of those cases, it involves the unexpected, late night presence of two squad cars acting simultaneously, *and* a close pull up perpendicular to the driver's side by one of them, *and* spotlights, *and* blocked egress on three sides, *and* an inability to exit by driving forward, *and* having to maneuver in reverse between and around the two

---

[5] The dissent contends that **Burton**, 441 F.3d 509, should be disregarded because of the "severely attenuated" reference. Dissent at ¶72. However, subsequent Seventh Circuit case law makes clear that **Burton**'s seizure rule is good law and that the reference to severe attenuation amounts to an observation that seizures can occur in a wide variety of possibly unexpected circumstances. *See, e.g.*, **Smith**, 794 F.3d at 686, which explains:

> [O]ur case law makes clear that officers need not totally restrict a citizen's freedom of movement in order to convey the message that walking away is not an option. In *United States v. Burton*, 441 F.3d 509 (7th Cir. 2006), three police officers approached the defendant's car on their bicycles. **Id.** at 510. One of the officers placed his bicycle in front of the car and the others placed their bikes on either side of it. **Id.** at 510-11. We held that "[i]t [was] a reasonable, in fact a compelling, inference that the police placed their bikes where they did in order to make sure that Burton didn't drive away before they satisfied themselves that there was no criminal activity afoot. By doing this they 'seized' the car, though in a severely attenuated sense." **Id.** at 511.

*See also* **Douglass**, 467 F.3d at 624 ("it is possible for the officers to have blocked a suspect's car so that he does not feel free to leave") (citing **Burton**, 441 F.3d at 510-11).

squad cars to avoid hitting either of them in order to exit.[6] We conclude that a reasonable person in these circumstances would not feel that he or she is free to leave.[7] *See Young*, 294 Wis. 2d 1, ¶65 ("A police officer's actions must be assessed in view of all the circumstances surrounding the incident" to determine if the actions would "cause a reasonable person to believe that he [or she] was not free to leave.").

¶30 Accordingly, we conclude that Evans was seized at the moment when the two squad cars simultaneously created the sudden, unexplained pincer-

---

[6] The dissent emphasizes the uncontested fact that Evans could have placed his car in reverse and directly backed up without hitting either of the two squad cars. *See, e.g.*, dissent at ¶69-2. This is true. But we respectfully suggest that the dissent fails to take sufficiently into account, as part of the totality of the circumstances, that a reasonable person in Evans's position would have worried that one or both of the officers might believe that various potential reversal maneuvers would bring Evans too close to, or actually strike, one of the squad cars. In short, when two squad cars converge on a car in this manner they limit exit choices for the reasonable person in the position of the targeted driver. In addition, the circuit court found only that Evans had a path of egress, but did not characterize that path.

More generally, the dissent discusses various aspects of the circumstances and concludes that none of these aspects by itself effectuated a seizure. Dissent at ¶¶76-85. The dissent's analysis misses the mark because it is the totality of all relevant elements here that signals a show of authority in the face of which a reasonable person would not feel free to leave. See *Young*, 294 Wis. 2d 1, ¶65 (stating that the police officers' actions "must be assessed in view of all of the circumstances surrounding the incident" to determine if the actions would "cause a reasonable person to believe that he [or she] was not free to leave.").

[7] Evans argues that our review of whether a reasonable person would have felt free to leave under the circumstances should take into account that Evans is an African-American man living in a country and state in which African-American men are disproportionately killed during police encounters. The Supreme Court acknowledged in *United States v. Mendenhall*, 446 U.S. 544 (1980), that African-American citizens interacting with white police officers may feel "unusually threatened" and has treated such considerations as neither "irrelevant" nor "decisive" in the determination of whether a reasonable individual would feel free to leave under the circumstances. *Id.* at 558. However, because we conclude that a reasonable person here would not have felt free to leave, even absent the perception of a heightened risk for violence, we do not address whether or how circumstances surrounding race may inform application of the objective reasonable-person standard in a case such as this one.

like formation and shined their spotlights on his vehicle under all of these circumstances.

¶31 The State points to what the officers did not do: park directly behind Evans's vehicle or activate their sirens or their red and blue emergency lights. The State in essence asks us to adopt the view that, so long as police are careful to leave some means of egress (even the potential reverse that we have described) and refrain from using sirens or emergency lights, they can create circumstances that have the effect of restraining the reasonable occupant of a vehicle but without triggering a seizure under the Fourth Amendment. The State also points to events that transpired after the officers got out of their squad cars. However, we have already explained why what the officers did do, before they got out of their squad cars, constituted a sufficient show of authority to effectuate a seizure. Accordingly, the State's attempt to downplay what happened before the officers exited their vehicles, and its resort to what happened afterward, are not persuasive.

¶32 Having determined the point at which Evans was seized by the officers, we now determine whether the officers had reasonable suspicion or any other constitutional justification to seize Evans at that time.

### III. Reasonable Suspicion

¶33 We first review the applicable legal principles governing whether a seizure is reasonable under the Fourth Amendment. We next apply those principles to the undisputed facts of this case and conclude that Evans's seizure was unreasonable.

¶34 We begin on this issue by noting that the State does not argue that, if there was a seizure as we have determined above, the officers were allowed to

effectuate it consistent with the Fourth Amendment on any ground other than reasonable suspicion, such as the existence of exigent circumstances.

¶35 An investigatory (or *Terry*) stop[8] is reasonable if it is supported by reasonable suspicion. *Vogt*, 356 Wis. 2d 343, ¶27. "An officer has reasonable suspicion when he [or she] possesses specific and articulable facts which would warrant a reasonable belief that criminal activity was afoot." *Id.* "The determination of reasonableness is a common sense test. The crucial question is whether the facts of the case would warrant a reasonable police officer, in light of his or her training and experience, to suspect that the individual has committed, was committing, or is about to commit a crime." *State v. Post*, 2007 WI 60, ¶13, 301 Wis. 2d 1, 733 N.W.2d 634. "A determination of reasonable suspicion is made based on the totality of the circumstances." *State v. Anderson*, 2019 WI 97, ¶33, 389 Wis. 2d 106, 935 N.W.2d 285.

¶36 An investigative stop must be based on more than a police officer's "inchoate and unparticularized suspicion or 'hunch.' Rather, the officer 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' the intrusion of the stop." *Post*, 301 Wis. 2d 1, ¶10 (quoted source omitted); *Vogt*, 356 Wis. 2d 343, ¶29 (reasonable suspicion requires more than a "savvy hunch" from an officer); *State v. Houghton*, 2015 WI 79, ¶¶12, 21, 364 Wis. 2d 234, 868 N.W.2d 143. However, the "standard for the stop is less than probable cause," *State v. Patton*, 2006 WI App 235, ¶9, 297 Wis. 2d 415, 724 N.W.2d 347, and a police officer is

---

[8] *Terry v. Ohio*, 392 U.S.1 (1968), announced the applicable constitutional standard for brief investigatory stops; *see State v. Chambers*, 55 Wis. 2d 289, 294, 198 N.W.2d 377 (1972) (recognizing the *Terry* standard).

"not required to rule out the possibility of innocent behavior before initiating a brief stop." *State v. Anderson*, 155 Wis. 2d 77, 84, 454 N.W.2d 763 (1990).

¶37    We now explain why we conclude that the record from the suppression hearing does not show specific and articulable facts sufficient to support reasonable suspicion that criminal activity was afoot at the time of the seizure. *Vogt*, 356 Wis. 2d 343, ¶27.

¶38    The circuit court's determination of reasonable suspicion in this case was based on the high-crime area, the time of day, and Evans's conduct in coming from and returning to the hotel and sitting in his parked car.  Our case law establishes that none of these facts alone creates reasonable suspicion and further it supports our conclusion that they do not do so when considered together.

¶39    A person's mere presence in a high crime area during the night cannot be relied upon to justify seizure.  We emphatically rejected such a contention in *State v. Gordon*, 2014 WI App 44, ¶15, 353 Wis. 2d 468, 846 N.W.2d 483.  In that case, officers saw Gordon and some companions walking along the street while on patrol in a high crime area. *Id.*, ¶3.  When Gordon noticed the police, he made a "security adjustment" by patting his pants pocket, as if to ensure that an item within was present and secure. *Id.*, ¶4.  The officers suspected that Gordon was concerned about an illegal firearm that he was carrying (he looked too young to own a firearm legally) and stopped Gordon to investigate. *Id.*, ¶5.  This court found that the officers lacked reasonable suspicion to stop Gordon.  In particular, the court noted the dangers of relying on Gordon's presence in a high crime area:  "many, many folks, innocent of any crime, are by circumstances forced to live in areas that are not safe—either for themselves or their loved ones." *Id.*, ¶15.  "[T]he routine mantra of 'high crime area' has the

tendency to condemn a whole population to police intrusion that, with the same additional facts, would not happen in other parts of our community." *Id.* "To conclude that mere presence in a high crime area at night is sufficient justification for detention by law enforcement is to accept *carte blanche* the implicit assertion that Fourth Amendment protections are reserved only for a certain race or class of people. We denounce such an assertion." *Id.* (quoting *United States v. Black*, 707 F.3d 531, 542 (4th Cir. 2013)). Similarly, the time of day, specifically the late night and early morning, encompasses far too much innocent conduct (such as by second-shift and third-shift workers at the hotel and nearby establishments) to establish, on its own, reasonable suspicion to justify seizure.

¶40 As to Evans's sitting briefly in an idling car, our supreme court has ruled that a car idling in a parking lot is not enough to establish reasonable suspicion. For example, in *Vogt*, an officer saw a car idling in a parking lot in the early hours of the morning. *Vogt*, 356 Wis. 2d 343, ¶4. Although the police officer suspected that the occupant had been drinking, our supreme court found that any hunch he had did not rise to the level of reasonable suspicion required to justify a seizure. *Id.*, ¶29.

¶41 The last fact we consider in isolation is Evans's coming from and returning to the hotel parking lot. The State asserts that there was more than a hunch here based on one of the officers' testimony that Evans's conduct was "consistent with" behaviors the officer had observed in his drug cases. However, we agree with Evans that the State mischaracterizes the record because the officer did not testify that he specifically found Evans's conduct to be "consistent with" his drug cases, only that he had seen some behavior, at some unspecified time, by some unspecified person, that was consistent with drug cases.

¶42    The following is the pertinent portion of the suppression hearing transcript:

> [Prosecutor]:  In the time that you've worked patrol in this area, based on your own experience, would you describe this area in any way?
>
> [Officer Brown]:  I know this area to be a high crime area, known for shots fired incidents, homicides and narcotic trafficking.
>
> [Prosecutor]:  Is that based on cases you have been involved in?
>
> [Officer Brown]:  Yes, it is.
>
> [Prosecutor]:  Have you made drug arrests in this area?
>
> [Officer Brown]:  Yes, I have.
>
> [Prosecutor]:  And have you observed conduct consistent with your drug cases?
>
> [Officer Brown]:  Yes, I have.
>
> [Prosecutor]:  Is the time of day that this happened significant to you at all?
>
> [Officer Brown]:  Yes, it is.
>
> [Prosecutor]:  Why?
>
> [Officer Brown]:  It's consistent with the time frame in which I make a lot of my drug arrests, and it's just unusual for, given the circumstances of this incident, for people to be up and moving at that time of day.

¶43    This excerpted transcript reveals testimony that the officer had made drug arrests in the area before, that he had observed conduct consistent with his drug cases, and that the time frame in which the interaction with Evans occurred was a time frame in which he had made a lot of drug arrests.  However, it does not show that the officer observed *Evans* exhibiting conduct consistent with drug cases.

20

¶44    We now turn to the totality of these facts. Of course, all of the facts identified above may together "be a significant aspect of the 'reasonable suspicion' calculus," under certain circumstances because we evaluate reasonable suspicion under the totality of the circumstances. *Gordon*, 353 Wis. 2d 468, ¶15. For example, a defendant's presence in a high drug trafficking area, when combined with the officer's previous arrest of that defendant, a corroborated tip from an informant, and the defendant's conduct provided reasonable suspicion in *Anderson*, 389 Wis. 2d 106, ¶57. There, our supreme court explained that:

> [T]he *Gordon* court was careful to observe that the result may have been different if other factors were present in the totality of the circumstances. Specifically, it wrote:
>
>> Without more (such as, for example and not by way of limitation, the officers being aware that the person they wanted to stop was either wanted on a warrant or was known to have committed gun crimes), these findings, either taken separately or added together, do not equal the requisite objective "reasonable suspicion" that "criminal activity" by Gordon was "afoot."
>
>> In this case, the "more" referenced by the *Gordon* court is present. Officer Seeger was aware that Anderson was known to have committed drug crimes—the officer had, after all, previously arrested Anderson for such a crime. Additionally, in this case we consider the tips Officer Seeger received indicating Anderson was selling drugs at a specific location, corroborated by Anderson's presence at that specific location and his behavior upon recognizing law enforcement. These factors that were not present in *Gordon* tip the balance.

*Id.*, ¶56-57.

¶45    The State argues that specific articulable facts supported reasonable suspicion here because Evans left a hotel with no luggage at a time when, one of the officers testified, aside from criminal activity, "[t]here's not really anything

else that goes on in that area at that time of day," drove briefly to a nearby parking lot, and returned and sat in a running car for several minutes, all in a high-crime area where the officer had made several previous drug arrests. However, none of these facts constitute the "more" referenced by *Gordon* and *Anderson*. There is no evidence that officers were aware that Evans had engaged in criminal activity in the past, that they were aware of any warrants, that they had received a tip regarding illegal activity, that Evans behaved suspiciously upon recognizing a police presence, or that any other specific and articulable facts supported the officers' hunch that Evans was engaged in illegal activity. Although it turned out that the officers found Evans to be in the illegal possession of a firearm, "there is nothing new in the realization that the Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all." *Arizona v. Hicks*, 480 U.S. 321, 329 (1987).

¶46 Finally, we agree with Evans that his case is also distinguishable from *Young*, 294 Wis. 2d 1. In *Young* our supreme court stated that an officer had reasonable suspicion that criminal activity was afoot because "[t]he officer described the particular facts that made him suspicious and linked those facts to his seven years of experience patrolling the neighborhood." *Id.*, ¶64. These facts included not only that the area was high-crime at that time of night, but also that five persons sat in an idling car for at least nine minutes around the corner from a popular bar that "had become a problem area for the police," the car was unfamiliar to the officer who had been patrolling the area for seven years and had Illinois plates, none of the occupants of the car entered or exited a bar or party, and the car did not drop anyone off or pick anyone up. *Id.*, ¶¶6-9. The officer testified that there was a correlation between these facts and the use of alcohol and

22

narcotics in cars. *Id.*, ¶61-63. Here, unlike in *Young*, there is no testimony that Evans's conduct correlated with specified criminal activity.

¶47 In sum, we conclude that the State has failed to identify specific articulable facts that would "tip the balance" here from a mere generalized hunch as in *Gordon* to reasonable suspicion as in *Anderson*, and that, therefore, the officers in this case lacked reasonable suspicion that Evans was engaged in criminal activity. Accordingly, we conclude that his seizure was unreasonable.

## CONCLUSION

¶48 For all these reasons, we conclude that Evans was seized before the officers emerged from their squad cars, and that the officers did not have reasonable suspicion to seize Evans at that time. Therefore, we reverse the circuit court's denial of Evans's suppression motion and remand for further proceedings.

*By the Court.*—Judgment reversed and cause remanded for further proceedings.

Not recommended for publication in the official reports.

No.     2020AP286-CR(CD)

¶49     FITZPATRICK, P.J. (*concurring in part; dissenting in part*).     I concur with the analysis and result stated in the majority opinion that the officers did not have reasonable suspicion that a crime had been, or was about to be, committed prior to the point in time the officers smelled marijuana smoke emanating from Evans's vehicle.  (Majority, ¶¶33-47.)

¶50     I part ways with my colleagues, and respectfully dissent from the majority opinion's analysis and result, regarding whether Evans was "seized" by the officers in the hotel parking lot prior to the time the officers smelled marijuana smoke coming from Evans's vehicle.  The circuit court's findings of fact, the record, and applicable authorities lead only to the conclusion that, prior to the time the officers smelled marijuana smoke coming from Evans's vehicle, Evans was not "seized" within the meaning of the Fourth Amendment.

## I.  Evans Was Not "Seized" Within the Meaning of the Fourth Amendment.

¶51     I start with the framing of this issue.

¶52     Once both police vehicles stopped, each officer got out of their car and walked toward Evans's vehicle.  (Transcript of Oct. 16, 2018 Motion Hrg., pp. 14, 16, 40.)[1]  Officer Brown testified that, as he walked toward Evans's vehicle, he could smell marijuana.  (Tr., pp. 14, 16.)  Officer Hoffman testified

---

[1] All references to the October 16, 2018 hearing transcript will be abbreviated as "(Tr., p. __.)."

that, upon stepping out of his vehicle, he "immediately noted an odor of marijuana in the air," and that odor became stronger as he approached Evans's vehicle. (Tr., pp. 39-40.) The circuit court found that "based on the testimony the court concludes that [the officers] did smell the odor of marijuana as they approached on foot and before they actually made contact with [Evans's] vehicle." (Tr., p. 68.)

¶53 I agree with the circuit court and the majority opinion (Majority, ¶3) that, when the officers smelled marijuana as they approached Evans's vehicle, there was probable cause to conclude that a crime had been, or was being, committed. *See State v. Secrist*, 224 Wis. 2d 201, 210, 589 N.W.2d 387 (1999). For that reason, the question is whether Evans was "seized" by the officers, within the meaning of the Fourth Amendment, in the short time between when the squad cars both stopped and the officers smelled marijuana as they walked toward Evans's vehicle.[2]

### A. Controlling Principles.

¶54 Our supreme court has summarized the principles we are to use in deciding this issue:

> A seizure occurs "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." [*United States v.*] *Mendenhall*, 446 U.S. [544,] 552, 100 S. Ct. 1870 [(1980)] (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1968)). As Justice Stewart stated in

---

[2] The testimony from the evidentiary hearing, and the circuit court's findings of fact, do not state the length of time between when both squad cars stopped in the parking lot and the officers stepped out of their vehicles. However, neither party contends that it was more than a few moments. Videos from body cameras and squad car cameras may shed light on that but, as noted in the majority opinion, the DVD in the record that is supposed to contain these videos is blank.

2

*Mendenhall*, "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* at 554, 100 S. Ct. 1870 (footnote omitted).

….

The rule that a seizure occurs only when law enforcement restrains a person's liberty by show of authority advances the goals of the Fourth Amendment:

The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but "to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *United States v. Martinez–Fuerte*, 428 U.S. 543, 554 [96 S. Ct. 3074, 49 L.Ed.2d 1116 (1976)]. As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.

*Mendenhall*, 446 U.S. at 553-54, 100 S. Ct. 1870.

*County of Grant v. Vogt*, 2014 WI 76, ¶¶20, 25, 356 Wis. 2d 343, 850 N.W.2d 253 (first set of brackets added).[3]

¶55 Of importance is our standard of review. Whether someone has been seized is a question of constitutional fact. *State v. Young*, 2006 WI 98, ¶17, 294 Wis. 2d 1, 717 N.W.2d 729. "As such, *we accept the circuit court's findings*

---

[3] Neither party, nor the circuit court, mentions that Evans could have "walk[ed] away" (using the phrase in *United States v. Mendenhall*, 446 U.S. 544 (1980)) instead of driving away. As a result, I will also ignore that distinction even though it raises the question as to whether Evans's person was seized as opposed to his vehicle. *See United States v. Mabery*, 686 F.3d 591, 597 (8th Cir. 2012) ("Nor would blocking the parking lot driveway establish a seizure of Mabery's *person*—he could have been free to leave, even if his vehicle had to remain parked.").

3

*of evidentiary or historical fact unless they are clearly erroneous*, but we determine independently whether or when a seizure occurred." ***Id.*** (emphasis added). Also of importance is that Evans never argues that the circuit court's findings of fact are clearly erroneous. Indeed, in briefing in this court, Evans concedes that the "historical facts of the police encounter are not in dispute."

¶56 For the reasons that follow, I conclude that, when the facts are looked at either individually or considered together, there was no seizure of Evans prior to the officers smelling marijuana smoke wafting from his vehicle.

¶57 I next discuss the circuit court's findings of fact, applicable portions of the record, and arguments from Evans.

### B. The Circuit Court's Findings of Fact, the Record, and Evans's Arguments.

¶58 A key premise to its conclusion is the majority opinion's assertions about where the two squad cars were positioned. *See, e.g.*, "Officer Brown pulled his squad car to within a few feet (less than the width of one parking space) of Evans's vehicle." (Majority, ¶7.) "At the same time, Officer Hoffman pulled his squad car similarly close (less than the width of one parking space) to Evans's vehicle." (Majority, ¶7.) From these assertions, the majority opinion contends that it would have been difficult for Evans to find a path to drive away. *See, e.g.*, "Here, the only path of egress for Evans's vehicle would have been for him to put it in reverse and then attempt whatever reversing maneuver Evans believed would avoid hitting or coming too close to the squad car diagonally behind him." (Majority, ¶25.) And, according to the majority opinion, those assertions are important to the conclusion that Evans was "seized." However, the assertions of

the majority opinion on those points cannot be reconciled with the circuit court's findings of fact, are not supported by the record, and are not argued by Evans.

### 1. The Circuit Court's Findings of Fact.

¶59    Whether it would have been difficult for Evans's vehicle to exit was raised in the circuit court, and the circuit court rejected that contention.

¶60    Based on the testimony of the police officers and the videos seen by the circuit court, in argument to the circuit court the parties pressed a factual dispute about Evans's route to exit once the police showed up.  The State argued in relevant part:  "When [the officers] got there, as you saw in the video, there was plenty of room for the defendant to have reversed between these two cars, the squads, I should say, and exit the parking lot."  (Tr., p. 59.)  Evans's position in the circuit court was manifested through his counsel's argument:  "And this narrow pathway of this parking lot with another concrete median behind it, it would be pretty precarious for him to be able to exit."  (Tr., p. 61.)[4]

¶61    At the conclusion of the evidentiary hearing, the circuit court made the following pertinent findings of fact in rejecting Evans's factual contention that Evans was hindered from driving away:

> Both of the squad cars did park in a way that would have
> allowed the vehicle that the defendant was in to back out of
> the parking lot.  Apparently the way the defendant's vehicle
> entered the parking lot, he was certainly parked in a

---

[4] The questioning of Officer Brown and Officer Hoffman by Evans's trial counsel at the evidentiary hearing, and Evans's argument in the circuit court, show that counsel's assertion about a "narrow" space referred to the space between the concrete barrier in front of Evans's vehicle and the concrete barrier for the parking spot directly behind Evans's vehicle.  Any reference to "narrow" did not refer to the space between the two squad cars.  (Tr., pp. 32, 51-52, 59, 61.)

5

> parking spot that didn't allow him to pull forward, but [Evans] could have backed out the way he came in. The squad vehicles were not parked so close or positioned in such a way that [Evans] was unable to back out of that lot.

(Tr., p. 67.)  After making other findings and conclusions, the circuit court concluded: "So for those reasons the court is denying the motion to suppress." (Tr., p. 69.)[5]

¶62    We cannot conclude that a circuit court's findings of fact are clearly erroneous if there is any credible evidence in the record, or any reasonable inference that can be drawn from that evidence, that supports the finding. *Insurance Co. of N. Am. v. DEC Int'l, Inc.*, 220 Wis. 2d 840, 845, 586 N.W.2d 691 (Ct. App. 1998); *see, e.g.*, *Vogt*, 356 Wis. 2d 343, ¶41 (concluding that the facts as found by the circuit court did not demonstrate that the defendant was seized because the defendant could have driven away, which supported the court's ultimate decision).  It is solely within the discretion of the circuit court to accept, reject, or give weight to portions of the testimony regarding the size of the space Evans would have driven through if he attempted to leave and whether Evans was hindered from driving away by the positions of the vehicles.  That discretion cannot be usurped by this court.

---

[5] In addition to the circuit court determining the credibility of the two police officers, relevant portions of the body and squad car camera videos were shown to the circuit court during the testimony of the officers. At two points in Evans's briefing in this court, Evans refers us to those videos. The DVD in the record is supposed to contain those videos but as noted it is blank, and we do not have the benefit of seeing those videos as the circuit court did. Evans, as the appellant, has the burden to ensure that the record on appeal is complete. *See State v. Marks*, 2010 WI App 172, ¶20, 330 Wis. 2d 693, 794 N.W.2d 547. "[W]hen an appellate record is incomplete in connection with an issue raised by the appellant, we must assume that the missing material supports the [circuit] court's ruling." *Fiumefreddo v. McLean*, 174 Wis. 2d 10, 27, 496 N.W.2d 226 (Ct. App. 1993).

¶63     It is true that, if a circuit court does not make an explicit finding on a factual point "that exists in the record, an appellate court can assume that the circuit court determined the fact in a manner that supports the circuit court's ultimate decision." **Vogt**, 356 Wis. 2d 343, ¶41.  Here, however, the circuit court did not fail to make a pertinent finding on whether Evans would have difficulty driving away.  Rather, the circuit court made findings of fact that cannot be reconciled with the factual assertions of the majority opinion already mentioned.  Moreover, while we can assume facts in the record that support a decision of the circuit court, the motion to suppress brought by Evans was denied.  Accordingly, this court is not allowed to, as I believe the majority opinion has done here, assume facts that are contrary to the ultimate decision of the circuit court and the specific, uncontested findings of fact of the circuit court.[6]

### 2.  The Record on the Position of the Police Vehicles.

¶64     The positioning of the two police vehicles should also be clarified.

¶65     As mentioned, the majority opinion states that the Brown squad car and the Hoffmann squad car were each less than the width of one parking space from the Evans vehicle.  (Majority, ¶7.)  Those assertions are not accurate as phrased.  In fact, there is no evidence to support those factual assertions of the majority opinion, the circuit court's findings of fact cannot be reconciled with those assertions, and (as will be seen) Evans never contends that the police vehicles were that close to his vehicle.

---

[6] The majority opinion also adopts, at numerous points, military-like language such as "in a pincer-like fashion" and "flanking maneuver" to describe the placement of the squad cars.  I suggest that these attempts to emphasize certain facts that cannot be reconciled with the circuit court's findings do not change the result.

¶66    For context, I note the following.  Evans agrees, at two points in his briefing in this court, that Officer Brown's squad car was not in the lane of traffic Evans would need to drive through to leave the parking lot.  Both Officer Brown and Officer Hoffman testified that the Hoffman squad car was not behind Evans's vehicle.  (Tr., pp. 13, 39.)

¶67    To determine the locations of the Brown squad car and the Hoffman squad car, a photo is reproduced below.  Evans twice placed the same photo in his brief-in-chief in this court.  He represents to us that the photo is taken from one of the videos entered into evidence at the evidentiary hearing, and the photo shows "the orientation of the vehicles."



¶68    Officer Hoffman testified that the video (from which the photo is taken) shows Officer Brown's squad car on the left, Evans's vehicle is the silver vehicle near the middle of the photo, and the front of Officer Hoffman's squad car is shown at the bottom of the photo.  (Tr., pp. 50-51.)  That photo establishes that

there was more than (not less than) the width of a parking space between Officer Brown's squad car and the Evans vehicle. The photo also establishes that: Officer Hoffman's squad car was not directly behind the vehicle parked on the passenger side of Evans's vehicle; and the Hoffman squad car was more than the width of one parking space from Evans's vehicle. Those facts just stated about the positions of the vehicles can be assumed by this court because each fact is supported by: the record in the form of the photo; the ultimate decision of the circuit court to deny Evans's motion; and the circuit court's factual findings including that "[t]he squad vehicles were not parked so close or positioned in such a way that [Evans] was unable to back out of that lot." *See id.*, ¶41.

### 3. Evans Does Not Make This Argument.

¶69    Evans does not renew in this court his argument made in the circuit court that there was a "narrow pathway" for his car to exit the parking lot. Evans, at a few spots in his briefing in this court, states only that to leave he would have been required to "maneuver … around" or "maneuver[] past" the squad cars. However, those snippets of phrases are not a developed argument from Evans that the squad cars and the car parked next to him hindered him from driving away. In addition, at no point in the circuit court or this court has Evans contended that the squad cars were less than the width of a parking space from his vehicle.

¶70    In his reply brief in this court, Evans recognizes the State's argument that the squad cars did not block him in. With the opportunity to try to rebut that argument from the State, Evans does not contend that he would have had any difficulty driving away, or any similar argument. Instead, Evans summarizes his arguments made in this court about why he was purportedly "seized" by law enforcement:

9

> The State does offer that the squad cars did not block Evans in. (State Br. at 13). While physically preventing a person from moving is sufficient to create a seizure, it is not necessary. A "person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." *Mendenhall*, 446 U.S. at 553…. As discussed in Evans's brief-in-chief, the police flexed their muscles and showed their authority by (a) arriving in two squad cars, (b) shining spotlights not found on civilian cars on Evans's car, and (c) ignoring the parking lot line markings in order to point the squad car and the spotlight directly at Evans as he was sitting behind the steering wheel. (Evans Br. at 8-9). A reasonable person could conclude that this was a signal that they were not free to leave.

(Reply Brief of Defendant-Appellant at p. 3.) Given the opportunity to make the argument that it would have been at all difficult for him to drive away because the opening for him to drive through was restricted, Evans does not do so. As a result, Evans has conceded the point. *Schlieper v. DNR*, 188 Wis. 2d 318, 322, 525 N.W.2d 99 (Ct. App. 1994) (stating that a proposition asserted by a respondent on appeal and not disputed by the appellant's reply may be taken as admitted).[7] I suggest that we should not, as I believe the majority opinion has done, make an argument for Evans that he decided not to make in this court. *See Industrial Risk Insurers v. Am. Eng'g Testing, Inc.*, 2009 WI App 62, ¶25, 318 Wis. 2d 148, 769 N.W.2d 82 ("[W]e will not abandon our neutrality to develop arguments [for the parties].").

---

[7] Evans does mention, but only in a hypothetical sense and in the context of his race, that "[a] reasonable person would have to be concerned that *if* they came too close to officers or drove too quickly, the officers would view that as an act of aggression, and defend themselves with their firearms." (Brief-in-Chief of Defendant-Appellant, p. 11.) (Emphasis added.) But, that is not an argument that the space was in fact narrow or that the vehicles were close to his.

### C. Federal Court Opinions.

¶71     The majority opinion (Majority, ¶17) states that federal courts have concluded "that blocking the movement of a vehicle may be a seizure, even if the car is not wholly blocked from leaving." In support of that statement, the majority opinion cites *United States v. Tuley*, 161 F.3d 513 (8th Cir. 1998). However, that opinion concerns only a vehicle that was wholly blocked from leaving and does not discuss situations in which a vehicle is not blocked in every direction from leaving:

> Blocking a vehicle so its occupant is unable to leave during the course of an investigatory stop is reasonable to maintain the status quo while completing the purpose of the stop. We conclude that blocking Tuley's truck with the squad car resulted in a Fourth Amendment seizure.

*Id.* at 515 (internal citations omitted). That paragraph of the majority opinion cites *United States v. Gross*, 662 F.3d 393, 399 (6th Cir. 2011) for the same point. However, again, the vehicle at issue in *Gross* was completely blocked from leaving. *See id.* at 399 ("Gross is correct that when Officer Williams blocked the car in, he began an investigatory *Terry* stop."). Accordingly, those federal court opinions do not assist the analysis of the issue before this court.

¶72     For the same proposition, the majority opinion also relies on *United States v. Burton*, 441 F.3d 509 (7th Cir. 2006). There, police officers placed their bicycles on three sides of a car while a man named Johnson was leaning into the window on the driver's side of Burton's car (the only side of the car where the police did not place their bicycles). *Id.* at 510. The Seventh Circuit recognized the limited usefulness of stating that the Burton car was "seized" under those facts:

> By … [placing police bicycles on three sides of the car the police] "seized" the car, *though in a severely attenuated sense*. Burton's car was stopped, albeit with its motor

11

> running, when the police approached, because he was talking (probably transacting) with Johnson. [Burton] could hardly have driven away with Johnson leaning into the window. Between the time the police moved Johnson away from the car to frisk him and the time they learned that Burton was not carrying a driver's license and was fussing in a suspicious manner with something in his pocket—a concatenation of suspicious circumstances that justified their ordering him out of the car and frisking him—only a few minutes elapsed. The net delay may have been zero, since Burton's transaction with Johnson was not complete. Had the police kept their distance, Burton would have remained stopped until he finished striking the drug deal with Johnson and the latter went and fetched the drugs.

*Id.* at 511 (emphasis added). With that explicit qualification of the conclusion about the car being "seized," the ***Burton*** opinion is of no, or at most limited, usefulness in the analysis of the facts of this case.

## D. The Experience of a Reasonable Person.

¶73 The State argues in this court that the officers could have, but did not, take certain actions in the parking lot, and that should be considered in determining if Evans believed he was free to leave. In reply, Evans argues that the subjective intent of the officers does not matter. Evans's reply misses the mark.

¶74 We must consider the effect of the officers' actions on a "reasonable person." *Vogt*, 356 Wis. 2d 343, ¶20. That reasonable person would have within his or her experience the actions a police officer may take in order to assert authority. In other words, any reasonable person will consider what the officers are doing, but that person will also consider the panoply of actions the officers may, but did not, take as a show of authority. The reasonable person will then consider actions taken, and not taken, in their calculus of whether he or she is free to leave. *See id.* (stating that courts must view all of the circumstances surrounding the incident).

12

¶75    Here, during the period of time when the purported seizing of Evans took place, there is no dispute that neither officer: (1) lit the red and blue lights on the top of their squad car; (2) gave verbal instructions[8] to Evans to stay where he was in the car; (3) used the siren on their squad car; (4) touched Evans;[9] (5) drew their weapon or taser;[10] or (6) knocked on the window of Evans's vehicle.[11]  Each of those actions might be an indication to a reasonable person that they were not free to leave.  Because the officers took none of those actions, this tends to support the conclusion that a reasonable person would believe that they were free to leave.

## E. Spotlights.

¶76    To come to its conclusion, the majority opinion relies in part on the fact that spotlights were used by the officers when they pulled up in the parking lot.  I do not find that to be an important facet of the analysis.

¶77    Our supreme court has stated that "[o]n these facts, we are reluctant to conclude that the positioning of the officer's car, together with the lighting [the officer] employed, necessarily involved such a show of authority that 'a reasonable person would have believed that he was not free to leave.'"  *Young*, 294 Wis. 2d 1, ¶69 (quoting *Mendenhall*, 446 U.S. at 554).  The supreme court recognized that "many courts" have come to the same conclusion:

---

[8] *See County of Grant v. Vogt*, 2014 WI 76, ¶23, 356 Wis. 2d 343, 850 N.W.2d 253 (citing *Mendenhall*, 446 U.S. at 554).

[9] *Id.*

[10] *Id.*

[11] *Id.*, ¶3.

> Although a police officer's use of a spotlight in conjunction with emergency flashers may constitute a show of authority, we note that many courts have concluded that the use of a spotlight is not a show of authority sufficient to effect a seizure. *See State v. Baker*, 141 Idaho 163, 107 P.3d 1214, 1216–18 (2004) (use of spotlight is no seizure; collecting cases holding the same); *State v. Young*, 135 Wash. 2d 498, 957 P.2d 681, 688–89 (1998) (finding that under the totality of the circumstances, illuminating the defendant with a spotlight does not a seizure make).

*Id.*, ¶65 n.18.

¶78 Case law from other jurisdictions supports that conclusion and establishes that the use of a spotlight encourages the safety of officers. *See, e.g.*, *United States v. Lawhorn*, 735 F.3d 817, 820 (8th Cir. 2013) ("The act of shining a spotlight on a person's car typically does not constitute a seizure."); *United States v. Mabery*, 686 F.3d 591, 597 (8th Cir. 2012) ("[T]he act of shining a spotlight on [the] vehicle from the street was certainly no more intrusive (and arguably less so) than knocking on the vehicle's window."); *Campbell v. State*, 841 N.E.2d 624, 628, 630 (Ind. App. 2006) (collecting state court cases and stating that, by itself, shining of spotlight does not reflect a show of authority to make a reasonable person believe that he or she is not free to leave); *Commonwealth v. Briand*, 879 N.E.2d 1270, 1272 (Mass. App. 2008) ("[The law enforcement officer's] use of take down lights to illuminate the area before approaching the vehicle did not constitute a seizure. To hold otherwise would discourage officers from using such lights when necessary for their safety or the safety of others."); *Dorsey v. United States*, 372 F.2d 928, 931 (D.C. Cir. 1967) ("If policemen are to serve any purpose of detecting and preventing crime by being out on the streets at all, they must be able to take a closer look at challenging situations as they encounter them.").

14

¶79    In addition to case law, common sense establishes that illuminating the area the officers are about to enter in the middle of the night helps to keep the officers (and others) safe. Officer Brown testified at the evidentiary hearing that he uses a spotlight to illuminate the general vicinity in front of his vehicle. (Tr., pp. 27-28.) Officer Hoffman testified that "typically at night [the spotlight is] turned on for my safety." (Tr., p. 46.)

¶80    I conclude that the use of spotlights in these circumstances would not lead a reasonable person to believe that they were not free to leave.

### F. More Than One Officer.

¶81    The majority opinion asserts several times that, because two squad cars were present, that makes a difference to the result. The Supreme Court has stated that one factor which may be considered in this context is the "threatening presence of several officers." *Mendenhall*, 446 U.S. at 554-55. But, I do not accept the implicit propositions of the majority opinion that "several officers" now means "more than one" and more than one officer is always "threatening." The fact that there were two officers present in these circumstances does not contribute in any material way to the question of whether a reasonable person would feel free to leave under these circumstances.

### G. Putting the Vehicle in Reverse.

¶82    The majority opinion continually returns to the fact that, to leave, Evans was required to put his car in reverse and drive in reverse for a few feet. That fact should not make a material difference to the analysis.

¶83    Our supreme court has cited with approval *State v. Randle*, 276 P.3d 732 (Idaho App. 2012). *See Vogt*, 356 Wis. 2d 343, ¶¶34, 38. In doing so, our

15

supreme court stated: "In considering [Randle's] motion to suppress the evidence of intoxication, the circuit court determined that even though he could not pull forward, the defendant could have backed up and driven away and was not seized." *Id.*, ¶34 (citing **Randle**, 276 P.3d at 737). In relying on **Randle**, the supreme court put no emphasis on the fact that the car needed to be put into reverse to leave rather than driving forward.

¶84 An opinion from the Iowa Supreme Court is instructive. In *State v. Fogg*, 936 N.W.2d 664 (Iowa 2019), the issue was whether a driver was seized for Fourth Amendment purposes. *Id.* at 665. The Iowa Supreme Court stated: "Fogg's appeal boils down to a simple point. The alley was only wide enough for one car at a time, and by driving down it from the north, Officer Frazier created a situation where [Fogg] would have had to leave by backing up about 125 feet to the south." *Id.* at 669. The court concluded that Fogg was free to leave and was not boxed in:

> It is true that Fogg could not have driven forward. *However, she could have driven backward either with or without turning around. She was not "boxed in."* 4 LaFave, *Search and Seizure* § 9.4(a) n.122, at 596-97. "[T]here was an avenue by which [Fogg] could have actually left." *County of Grant v. Vogt*, 356 Wis. 2d 343, 850 N.W.2d 253, 265, 268 (2014) (finding no seizure when the deputy pulled up behind a vehicle in a parking lot, got out, and knocked on the window of the defendant's car because the defendant could have "pulled forward and turned around").

*Id.* at 670 (emphasis added).

¶85 More important than the case law is common experience of reasonable persons. Placing a vehicle into reverse (as opposed to placing a vehicle into forward gear) and driving in reverse for a few feet in a parking lot to leave a parking space is an act that Wisconsin residents accomplish millions of times each

year. It is not an act reserved for specially trained drivers. A reasonable person who believes that they are free to leave police presence by putting their vehicle in gear to drive forward is not going to believe they cannot leave police presence because they must put the car in reverse gear and drive in reverse for a few feet as part of the process of leaving. The citizenry of Wisconsin does not consider driving in reverse for a few feet to be so onerous that they feel frozen in place and not free to leave.

### H. Supreme Court's Opinion in *Vogt*.

¶86    Finally, I conclude that the *Vogt* opinion from the Wisconsin Supreme Court leads to the conclusion that a reasonable person in Evans's position would have believed they were free to leave.[12]

¶87    As with the Evans vehicle, the *Vogt* vehicle was boxed in on three sides:

> Although Deputy Small pulled up behind Vogt's vehicle, there was testimony at trial that Vogt might have

---

[12] At Majority ¶28, the majority opinion relies on another federal court opinion and considers it more "instructive" than Wisconsin authority. That opinion is *United States v. Johnson*, 874 F.3d 571 (7th Cir. 2017). But, that court confirmed that whether the car was "seized" within the meaning of the Fourth Amendment made little difference:

> The district judge treated this as a seizure; so do we. But issuing a ticket always entails a brief seizure…. What is more, when the officers approached this parked car, no one was in the driver's seat. (The driver was inside a liquor store making a purchase.) So both as a matter of the suspects' legal entitlements and as a matter of brute fact, it did not make any difference whether the police approached with two cars rather than one, or whether the cars' spotlights were on. Johnson's car was not going anywhere.

*Id.* at 574. In light of that court's own comments, I fail to see how that federal court opinion is "instructive."

17

> had 50 feet in front of him in which he could have pulled forward and turned around. In addition, the video from the camera in Deputy Small's squad car shows ample room for the car to move forward. There was some discussion about ice washing up onto the lot in the past; however, there is no ice visible on the video and no evidence that there actually was ice on December 25, 2011. Thus, we assume that because the circuit court determined that a reasonable person in Vogt's circumstances would have felt free to leave, there was an avenue by which Vogt could have actually left. Like the defendant in Randle who was not seized simply because the grassy knoll limited his exit options, **Randle**, 276 P.3d at 733, 738, Vogt was not seized simply because there was only one way out of the parking lot.

**Vogt**, 356 Wis. 2d 343, ¶42; *see also* **State v. Snyder**, No. 2013AP299-CR, unpublished slip op. ¶16 (WI App Oct. 2, 2014) (Blanchard, J., authoring) (recognizing that the Vogt vehicle had "obstacles on three sides").

¶88 The Vogt vehicle could not have continually driven forward to leave the area where the deputy was standing next to Vogt's window because no more than fifty feet ahead of the Vogt vehicle was the edge of the Mississippi River. Instead, to leave the area, Vogt was required to make a U-turn in that fifty-foot area and then drive directly past the same deputy in order to leave. **Vogt**, 356 Wis. 2d 343, ¶42; *see also* **Snyder**, No 2013AP299-CR, ¶19 ("As I read **Vogt**, while Vogt had fifty feet in which to pull forward, still, in order to leave the area Vogt would have needed to make a U-turn and then pass the deputy."). On those facts, our supreme court concluded that "a reasonable person in Vogt's situation would have felt free to leave." **Vogt**, 356 Wis. 2d 343, ¶53.

¶89 The facts in this case and **Vogt** are, of course, not exactly the same. However, I fail to see any material difference between Evans putting his vehicle into reverse to leave as opposed to Vogt leaving the presence of the deputy. The record does not show any more difficulty for Evans in putting his car in reverse for

a few feet and leaving as compared to Vogt trying not to drive over the deputy's feet as he moved the car forward, avoiding the Mississippi River with a quick U-turn, and then avoiding the deputy again as he drives past the deputy. Moreover, in *Vogt*, the deputy was in a personal, immediate interaction with Vogt by rapping on Vogt's window. That personal and immediate deputy at the window is not present in this case. Put another way, our supreme court concluded that a reasonable person in Vogt's circumstances would believe he was free to leave and not seized by a show of authority. It follows that a reasonable person in Evans's circumstances would believe they were free to leave and not subject to a show of authority from the police officers.

¶90 In sum, when considered either individually or collectively, I conclude that the facts in this case would have led a reasonable person in Evans's situation to believe that they were free to leave. Accordingly, I also conclude that Evans was not seized within the meaning of the Fourth Amendment prior to the time the officers smelled marijuana smoke coming from Evans's vehicle. I would affirm the order and judgment of the circuit court.

¶91 For those reasons, I concur in part with the majority opinion, and I respectfully dissent in part from the majority opinion.